ALLEN–MYLAND, INC.

v.

INTERNATIONAL BUSINESS MACHINES CORPORATION.

Civ. A. No. 85–6166.

United States District Court, E.D. Pennsylvania.

Sept. 6, 1990.

---

Robert G. Levy, and Frank, Bernstein, Conaway and Goldman, Baltimore, Md., for Allen–Myland, Inc.

Evan R. Chesler, Cravath, Swaine and Moore, New York City, for International Business Machines Corp.

TABLE OF CONTENTS—MEMORANDUM OF SEPTEMBER 6, 1990

I. BACKGROUND ........................................................ 525
 A. Procedural History ............................................... 525
 B. The IBM 3090 Computer System .................................... 526
 C. AMI's Reconfiguration and Split Activity on 3090 Systems ........... 529
II. DISCUSSION ........................................................ 530
 A. IBM's Third Counterclaim—Infringement of IBM's 3090 Microcode Copyright ............................................................... 530
 i. Copyrightability of the 3090 Microcode ......................... 531
 ii. 17 U.S.C. § 107 .............................................. 533
 iii. 17 U.S.C. § 117 ............................................. 535
 iv. 17 U.S.C. § 109 ............................................. 537
 v. Consent Decree .............................................. 538
 a. AMI's Copying in Support of Reconfigurations ............... 540
 b. AMI's Copying to Perform Splits ........................... 541
 vi. Copyright Estoppel Based on IBM's Conduct Relating to 308X Microcode ........................................................... 547
 vii. Self Help .................................................. 548
 viii. Unclean Hands ............................................. 548
 ix. Other Defenses Asserted by AMI .............................. 549
 B. IBM's Fourth Counterclaim—Breach of Contract for a 3090 400E/200E Split RPQ ......................................................... 550
 C. IBM's Fifth and Sixth Counterclaims—Lanham Act and Unfair Competition for 3090 Microcode Labels and Screen Notices ................. 552
 D. IBM's First Counterclaim—Breach of Contract for 308X Net Priced Upgrades ........................................................... 554

E. AMI's Count V—Tortious Interference with Contracts and Prospective Contractual Relations Concerning Memory Cards and Splits .......... 555
F. AMI's Count VI—Breach of Contract to Provide 3090 Microcode License 558
G. AMI's Count VII—Breach of Obligations to AMI as a Third Party Beneficiary of the Document of Understanding between IBM and the Ad Hoc Committee................................................... 558
III. RELIEF........................................................ 559

## MEMORANDUM

O'NEILL, District Judge.

Allen–Myland, Inc. ("AMI") brought this action challenging various business practices of International Business Machines Corporation ("IBM") under the Sherman Act and state common law. After the issuance in 1988 of my decision following trial of AMI's Section 1 Sherman Act claim, AMI filed additional claims and IBM filed additional counterclaims. During the spring of this year, I tried all but one of the remaining claims[1] and counterclaims in this action, including: a counterclaim that AMI infringed IBM's copyright in a computer program, the 3090 microcode; two counterclaims that AMI violated the Lanham Act and engaged in unfair competition by labelling the copies of the 3090 microcode it made as produced by IBM; two counterclaims that AMI breached contracts with IBM; a claim that IBM tortiously interfered with AMI's contracts and prospective contractual relations in its business practices regarding memory cards and splits of IBM computers; a claim that IBM breached a contract to provide AMI a 3090 microcode license; and a claim that IBM breached a contract of which AMI is a third party beneficiary.

Jurisdiction over these claims is based on 28 U.S.C. §§ 1332, 1338(a) and (b) and pendent jurisdiction. The parties tried these claims before me without a jury. I bifurcated trial, and the record as to liability has been closed. This memorandum constitutes my findings of fact and conclusions of law. See Fed.R.Civ.P. Rule 52(a).

## I. BACKGROUND

### A. *Procedural History*

This action commenced on October 25, 1985, when AMI filed its original complaint against IBM alleging violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, unfair competition, and tortious interference with business and prospective business relationships. IBM's original counterclaims were filed on December 30, 1986; they asserted claims of copyright infringement, breach of contract and tortious interference with a contract. The parties agreed to try the liability issues relating to AMI's Section 1 Sherman Act claim separately. I issued an opinion resolving this claim in favor of IBM on July 21, 1988. *AMI v. IBM*, 693 F.Supp. 262 (E.D.Pa.1988).

On August 10, 1988, AMI moved for leave to supplement its complaint with three additional counts, including one claim that IBM had violated provisions of the Consent Decree entered by the United States District Court for the Southern District of New York on January 25, 1956 in *United States v. IBM*, No. 72–344 (the "Consent Decree"). I placed the present action in suspense on October 6, 1988 pending resolution of AMI's anticipated declaratory judgment action before that Court seeking a declaration concerning the Consent Decree's applicability to IBM's counterclaims in the present action. Without opining on that subject, the New York District Court dismissed AMI's declaratory judgment action on June 20, 1989, 714

---

1. AMI's counsel has agreed that it is appropriate to enter judgment in favor of IBM on AMI's Section 2 Sherman Act claim because AMI cannot succeed on that claim unless my rulings in the first trial regarding IBM's market power and the applicable market are not upheld. By agreement of counsel, AMI's Count IV, alleging tortious interference, has been stayed pending possible certification to the Court of Appeals of the claims resolved in both trials.

F.Supp. 707. *See infra,* at 540, n. 28. I removed the present action from the suspense docket on June 30, 1989.

IBM moved to bar use of the Consent Decree by AMI in the present action on July 14, 1989. I denied IBM's motion without prejudice to its renewal after trial of the remaining claims and counterclaims.

IBM filed amended and supplemental counterclaims on October 11, 1989, asserting claims against AMI of: breach of contract and tortious interference relating to 308X net priced upgrades;[2] copyright infringement in the unauthorized copying and distribution of 3090 microcode; breach of contract for failure to pay for a split RPQ ordered and received from IBM; and violation of the Lanham Act and unfair competition in distributing 3090 microcode with unauthorized replicas of IBM labels. AMI again moved to supplement its complaint with 11 new counts. On December 4, 1989, I permitted AMI to file three of the proposed counts asserting claims of: tortious interference with contracts and prospective contractual relations; breach of contract to provide a 3090 microcode license; and breach of a contract of which AMI is a third party beneficiary.

B. *The IBM 3090 Computer System*

IBM manufactures and sells, among other products, large scale high performance computer systems. At present, IBM's highest performance computer system product line is the 3090 line, introduced in 1985. Granito, Tr. at 10. Within the 3090 line, there are 42 different models available, and over 29,000 different model, memory and feature configurations possible. Granito, Tr. at 29–30; DX 4236–A. Since 1985, IBM has introduced the E, S and J families of 3090 computer systems, each offering improvements in technology, function and performance over the previously introduced families. Granito, Tr. at 10–11; DX 4232–A.

An individual 3090 computer system consists of a 3090 central processing unit, one or two 3097 power and cooling distribution units, a 3092 processor controller, two 3370 disk drives attached to the 3092, consoles for the use of the operator or service personnel, and input/output devices attached to the 3090. Granito, Tr. at 6–7; DX 4187. Some models of the 3090 system are multiprocessors, containing duplicates of every element, including processors, power supplies and power controls, so that one half of the machine can be taken away or powered down and the other half can continue operating. Granito, Tr. at 34.

The 3092 performs a variety of functions for the 3090 system, including machine startup, monitoring machine performance, error recovery, performing self-diagnostics and supporting the servicing and reconfiguration of the system. Hogan, Tr. at 114–140. In all but the smallest models of the 3090 family, the 3092 contains two duplicate processors and associated memory and related circuitry. Granito, Tr. at 7; Hogan, Tr. at 132–133. Each of the 3370s contains a complete copy of the computer software referred to by the parties as the "3090 microcode". Granito, Tr. at 7, 46. Thus, each of the processors within the 3092 has a complete copy of the 3090 microcode available on a 3370 from which to run and perform the various processor controller functions. Granito, Tr. at 7, 36–39.

The 3090 microcode contains a modified version of IBM's VM operating system and various application programs that perform the processor controller functions. Hogan, Tr. at 141–144; Granito, Tr. at 45–46; Belgard, Tr. at 1365; Belgard, Dep. Tr. at 30; Allen, Dep. Tr. at 955–956. Information about the configuration of the 3090 system also is contained in the 3090 microcode. Belgard, Tr. at 1365.

When a 3090 system operates in "single image mode", one side of the 3092 performs the processor controller functions for the system using the 3090 microcode stored on one of the 3370s. The other side of the 3092, using the 3090 microcode stored on the other 3370, serves as a backup to the active side of the 3092, and also

---

**2.** IBM voluntarily withdrew its Second Counterclaim, which asserts the tortious interference claim. *See* IBM's Pretrial Memorandum, at 1, n. 1.

performs self-diagnostic programs. Granito, Tr. at 74; Hogan, Tr. at 120, 1554–1555; DX 5643. A 3090 system which is a multi-processor also can operate in "partitioned mode", under which each half of the 3090 system is logically separate and runs its own operating system. Each of the 3092s and each of the copies of 3090 microcode stored on the 3370s is in active use simultaneously in this mode of operation. Granito, Tr. at 74–76; Hogan, Tr. at 120.

The redundancy of the 3092 and twin 3370s allows the 3090 system to continue operating even if one 3370 or the active side of the 3092 should fail and require repairs. Granito, Tr. at 35–37. IBM has calculated that this redundancy dramatically reduces the projected failure rate of the 3090 system: while a 3090 system configured with a 3092 having only a single processing side and one 3370 would fail once a year on average, a 3090 system configured with a two-sided 3092 and twin 3370s is projected to fail only once every 182.5 years. Granito, Tr. at 38; DX 4238.

IBM supplies for each 3090 system an archival copy of the 3090 microcode on five magnetic tapes, tape cassettes or optical disks. This copy of the 3090 microcode is accessible to IBM or third party customer service engineers to replace the microcode on the 3370s if it is damaged or destroyed, or if IBM releases a new version of the microcode. Granito, Tr. at 7–9; Bieschke Dep., Tr. at 60–61; DX 4178; DX 4179; DX 4180. In mid-1987, IBM issued a set of instructions known as the Carrier EC, directing its customer engineers to make certain that: only the latest version of the 3090 microcode was kept with an individual 3090 system for archival purposes; all archival tapes, cassettes and disks were labeled "Property of IBM"; and all archival copies were kept by the customer engineers in a secure location or area under IBM control. Conti, Tr. at 204–205; Bigando, Tr. at 1614–1615; DX 5610.

In July 1988, IBM modified the Purchase Agreement under which 3090 systems are sold to classify the 3090 microcode as part of a category called "Licensed Internal Code." PX 1263; Conti, Tr. at 225–226. The modified Purchase Agreement grants a license for limited use of Licensed Internal Code, including the 3090 microcode, to "the owner or the rightful possessor" of a 3090 system.[3] Both before and after this modification of the Purchase Agreement, IBM has used the feature codes "9201", "9202" or "9203" in the Purchase Agreement to designate the media on which the 3090 microcode is provided, respectively tape, cassette or optical disk. Where one of these feature codes is used, the purchase price listed is "N/C", for "no charge." Allen, Tr. at 1321; DX 4519; DX 4675; PX 1242.

IBM published the original version of the 3090 microcode on August 23, 1985, and registered it with the United States Copyright Office on November 12, 1986 for use on all then existing models of the 3090 line. DX 4002. IBM subsequently published and

---

**3.** The Purchase Agreement provides, in relevant part:

IBM owns copyrights in Licensed Internal Code (Code). IBM owns all copies of Code, including all copies made from them.

. . . . .

Each license authorizes [the Customer]:
a) to execute the Code to enable the Specific Machine to perform in accordance with IBM's official published specifications (specifications);
b) to make a backup or archival copy of the Code unless one is provided by IBM. [The Customer] may use this copy only to replace the original on the Specific Machine; and
c) to execute and display the Code as necessary to maintain the Specific Machine.
[The Customer] may not:

a) otherwise copy, display, adapt, modify or electronically distribute the Code except as may be authorized in the specifications;
b) reverse assemble, reverse compile, decode or translate the Code; or
c) sublicense, assign or lease the Code.
[The Customer] will include the copyright notice(s) and any legend(s) on each authorized copy.
[The Customer] may transfer possession of the Code to another party only with the transfer of the Specific Machine. [The Customer's] license is discontinued when [the Customer is] no longer an owner or a rightful possessor of the Specific Machine. In addition, the terms and conditions of this Section apply to Code [the Customer] acquire[s] from another party.
PX 1263.

registered at least 10 later versions of the 3090 microcode: Engineering Change levels 620, 630, 630B, 660B, 665, 670, 675, 675D, 765 and 852. DX 4004; DX 4005; DX 4006; DX 4007; DX 4008; DX 4009; DX 4011; DX 4012; DX 4013; DX 4014. Since the introduction of the 3090 system IBM has placed a copyright notice on all distributed tapes, cassettes or disks containing the 3090 microcode. PX 1333, at ¶ 13. A copyright notice also appears on the screen of the operator's console when a 3090 system is first powered up. Greene, Tr. at 891–892; PX 1400.

An individual 3090 computer system can be reconfigured into another model 3090 system in the same family, or a 3090 system in another family. Granito, Tr. at 27–31; DX 4236–A. Some 3090 systems also can be split into two lower performance 3090 systems. PX 1333, at ¶ 5. In order to reconfigure or split a 3090 system, it is necessary not only to change system hardware, for example by adding or removing processors, memory and input/output devices, but also to change the 3090 microcode, since the 3092 cannot function properly unless it is using 3090 microcode tailored for the system's exact configuration. Granito, Tr. at 48–49.

It is possible physically to split a 3090 system into two smaller 3090 systems that will function independently without making additional copies of the 3090 microcode. Allen, Tr. at 1041–1043, 1279–1280; PX 1400. To split a 3090 system into two smaller 3090 systems configured with full redundancy in the 3092 and 3370s, however, requires two copies of 3090 microcode in addition to those on the 3370s attached to the original 3090 system. Granito, Tr. at 62–64. IBM will certify for IBM maintenance only 3090 systems configured with full redundancy in the 3092 and 3370s. IBM's Post–Trial Memorandum of Law, at 8, n. 8 (continued from p. 7); Allen, Tr. at 1280.

For a customer who wants to reconfigure a 3090 system as a different model or family 3090 system, IBM will supply the replacement 3090 microcode necessary to complete the reconfiguration without any hardware parts that may be required through a Request for Price Quotation, or RPQ. Bigando, Tr. at 1597–1598; Conti, Tr. at 201–203; DX 4523. IBM charges $420 for each 3090 microcode tape required for the reconfiguration. Reconfigurations of 3090 systems require replacement of between one and five 3090 microcode tapes, depending upon the type of reconfiguration. Conti, Tr. at 202–203.

Between December 1, 1988 and December 31, 1989, IBM received 485 orders for 3090 microcode tapes to support reconfigurations. On average, these tapes were requested to be shipped within 2.7 business days, and actually were shipped by IBM within 3.4 business days. During the same period, AMI placed 43 orders for 3090 microcode tapes, seeking, on average, shipment within 1.9 business days. IBM shipped AMI's completed orders, on average, within 2.0 business days. The IBM personnel who fill 3090 microcode RPQ orders do not know or investigate to determine whether a particular order has been placed by IBM Credit Corporation or by another 3090 system owner. Bigando, Tr. 1609–1612; DX 5644; DX 5645.

IBM also will supply through a split Request for Price Quotation, or split RPQ, the replacement 3090 microcode required by a customer who wants to split a 3090 system into two smaller 3090 systems. IBM charges a fee for the split RPQ designed to account for the difference in price between the original 3090 system and the two resulting smaller 3090 systems, and therefore to neutralize the risk of "arbitrage" resulting from this difference. Dellasega, Tr. at 584–585. For example, IBM sells a Model 400E 3090 system for $8,375,000, and a Model 200E 3090 system for $4,500,-000. Conti, Tr. at 194–195; DX 4385. Additional hardware required to make two complete Model 200Es from one Model 400E costs $279,000. As a result, absent an additional charge for 3090 microcode or for labor, two Model 200Es produced from a split Model 400E cost $346,000 less than two Model 200Es purchased from IBM. To close this risk of "arbitrage", IBM charges $333,000 for the additional 3090 microcode required to accomplish this split, or $350,-

000 for the 3090 microcode plus labor. Conti, Tr. at 194–195; Phillips, Tr. at 1442–1443; DX 5620.

## C. *AMI's Reconfiguration and Split Activity on 3090 Systems*

Since 1973, AMI has been engaged in the business of providing engineering services to owners of IBM large scale mainframe computers. Allen, Tr. at 990–991. AMI has performed splits and reconfigurations on the mainframe computer lines which IBM sold prior to the 3090, including the 360, 370, 3033 and 308X lines. Allen, Tr. at 990–994; PX 1240.

AMI has performed numerous reconfigurations and four splits of 3090 computer systems. Allen, Tr. at 1001–1005. To support these activities, AMI has compiled and maintained a library of 3090 microcode tapes, comprised of: original 3090 microcode tapes; copies of 3090 microcode tapes 1, 3, 4 and 5 (of the five tapes, cassettes or disks on which IBM supplies the archival copy of the 3090 microcode); and copies of 3090 microcode tape 2, some of which were unaltered, and some of which have been modified by AMI. PX 1333, at ¶ 34. As of the time of trial, according to AMI president Allen, AMI's library contained 96 copies of 3090 microcode tapes 1, 3 or 4, and 400 copies of 3090 microcode tape 2. Allen, Tr. at 1171, 1179–1184. Allen admitted at trial that he did not believe that the copies made for AMI's library or in the course of completing reconfigurations or splits were authorized by IBM. Allen, Tr. at 1344.

To stock its library, AMI has copied 3090 microcode obtained from numerous sources, including 3090 microcode tape 2s AMI ordered from IBM, 3090 microcode supplied with systems sent to AMI for reconfiguration, or upon which AMI performed work at its customer's location, and 3090 microcode tapes sent to AMI by Comdisco, a computer leasing company which has used AMI's engineering services for its 3090 systems. Guadagno, Tr. at 360; Allen, Tr. at 1305–1306; Allen Dep., Tr. at 131–134, 169; Zartler Dep., Tr. at 184, 187; DX 4525.

AMI has copied and used 3090 microcode for reconfigurations in three different ways since it began compiling its library in March 1987. Allen, Tr. at 1211; DX 4555. In some instances, AMI modified a 3090 microcode tape which came with the 3090 system sent to AMI for reconfiguration, sent the modified tape out with the reconfigured machine, and stored copies of the original and modified tapes in its library. Allen, Tr. at 1066. In other cases, AMI searched in its library for a 3090 microcode tape copied from a system closely matching the configuration which AMI hoped to produce, made any necessary modifications, and produced a new copy of the tape for use on the reconfigured machine, changing the serial number on the 3090 microcode from that of the machine from which it had been copied to the serial number of the reconfigured machine. Allen, Tr. at 1066, 1211; PX 1333, at ¶ 36. Finally, in 30 to 40 instances AMI created "rainbow" 3090 microcode tapes by combining portions of tapes in its library copied from several different 3090 systems, changing the serial number to that of the reconfigured machine on which the rainbow tape was to be installed, and sometimes making other modifications. Allen, Tr. at 1067, 1070, 1211.

When using its library to provide 3090 microcode for a reconfiguration, AMI typically made at least five copies of a portion or of an entire copy of the 3090 microcode: the original IBM 3090 microcode tape was copied into the library; AMI modified the original tape and copied the modified 3090 microcode to its library; the modified 3090 microcode was copied onto tape to load the microcode on the reconfigured 3090 and to serve as a backup; and the modified 3090 microcode was copied onto each of the two 3370s for the reconfigured machine. Guadagno, Tr. at 286–287; Allen, Tr. at 1016–1017; Allen Dep., Tr. at 148–151, 157–159, 165.

AMI has performed four splits of 3090 Model 400E systems into two Model 200E systems using 3090 microcode tapes from its library. Allen, Tr. at 1005. For all four splits, AMI created and supplied rainbow tapes of 3090 microcode from the tapes it

had copied into its library from many different 3090 systems, including one 3090 system owned by IBM Credit Corporation. Guadagno, Tr. at 329–342; DX 4582; DX 4583; DX 4584; DX 4585. To provide 3090 microcode for each 200E produced by these splits, AMI engaged in at least ten separate acts of copying a portion of or making a complete copy of 3090 microcode. Guadagno, Tr. at 333–334.

In one split, of 3090 Model 400E serial number 70409, AMI also used 3090 microcode provided by IBM in response to a split RPQ ordered by AMI. Guadagno, Tr. at 340–341; DX 4584. AMI has not paid IBM for this split RPQ. Allen, Tr. at 1357.

On the copies of the 3090 microcode that AMI created and sent to its customers with reconfigured or split 3090 systems, AMI affixed labels virtually identical to those attached by IBM to the archival 3090 microcode tapes, cassettes or disks. Guadagno, Tr. at 278–279; DX 4701. The labels contain, among other information, the IBM copyright notice, notice that the tape is IBM property and that unauthorized use is prohibited, and the serial number of the 3090 system with which AMI shipped the 3090 microcode. DX 4701. Allen testified that AMI "intentionally attempted to duplicate that label as IBM would have produced it." Allen, Dep. (Custodian of Records) Tr. at 83.

## II. DISCUSSION

### A. *IBM's Third Counterclaim—Infringement of IBM's 3090 Microcode Copyright*

IBM's Third Counterclaim alleges that the 3090 microcode is copyrightable and has been copyrighted by IBM, and that AMI has infringed IBM's copyright by its unauthorized copying and distribution of the 3090 microcode. Under 17 U.S.C. § 106, the copyright owner has exclusive rights, among other things, to reproduce and distribute copies of the copyrighted work and to prepare derivative works based upon the copyrighted work.[4] To establish its claim of copyright infringement, IBM must show two things: that it owned a valid copyright on the 3090 microcode; and that AMI copied the 3090 microcode. *Whelan Associates v. Jaslow Dental Laboratory,* 797 F.2d 1222, 1231 (3d Cir.1986), *cert. denied* 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987).

AMI does not dispute that IBM properly registered the 3090 microcode in accordance with 17 U.S.C. § 410(a), or that IBM provided notice of its copyright in compliance with 17 U.S.C. § 401. AMI's Memorandum in Opposition to IBM's Post–Trial Memorandum of Law, at 17; PX 1333, at ¶ 13. IBM's certificates of registration for the 3090 microcode constitute prima facie evidence of the copyright's validity under 17 U.S.C. § 410(c). *See supra,* at 527.[5] The evidence established that AMI has engaged in extensive copying of the 3090 microcode, both to stock its library and to supply the 3090 microcode to reconfigured or split 3090 systems. *See supra,* at 529–530.

AMI advances as defenses to IBM's copyright infringement counterclaim that: the 3090 microcode is not copyrightable; AMI's copying is permissible under 17 U.S.C. §§ 107, 117 and 109; IBM is estopped from asserting this counterclaim by its violations of the Consent Decree; IBM is estopped by its previous conduct regarding AMI's copying of 308X microcode; AMI's copying was justified self-help; IBM is guilty of unclean hands and copyright misuse; AMI's copying impliedly was li-

**4.** § 106 provides, in relevant part:

Subject to sections 107 through 118, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease or lending;....

17 U.S.C.A. § 106 (1977).

**5.** § 410(c) provides, in relevant part:

In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate.

17 U.S.C.A. § 410(c) (1977).

censed by IBM; IBM breached an agreement to provide AMI a license to copy 3090 microcode; IBM's claim is barred by the statute of limitations, laches and waiver; and the 3090 microcode is in the public domain. I will discuss each of these defenses in turn.

i. *Copyrightability of the 3090 Microcode*

AMI contends that tape 2 of the 3090 microcode contains material which cannot be copyrighted under 17 U.S.C. § 102, and that the 3090 microcode as a whole cannot be copyrighted because of the relationship between the 3090 microcode and the operation of the 3090 system.

17 U.S.C. § 101 defines a "computer program" as "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." As the Court of Appeals for the Third Circuit stated in *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1249 (3rd Cir.1983), *cert. dismissed*, 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984), "a computer program, whether in object code or source code, is a 'literary work' and is protected from unauthorized copying" under 17 U.S.C. § 102(a) if it is an original work of authorship fixed in a tangible medium of expression.

 AMI concedes that "there is valid copyrightable material within the microcode." AMI's Memorandum in Opposition to IBM's Post–Trial Memorandum, at 17. AMI nevertheless contends that tape 2 of the five 3090 microcode tapes supplied by IBM for archival purposes is not copyrightable because it consists largely of a parts list lacking sufficient originality to be copyrightable under *Toro Co. v. R & R Products Co.*, 787 F.2d 1208 (8th Cir.1986). AMI also argues that tape 2 is in digital code not intelligible to or usable by humans, and therefore is not copyrightable under 17 U.S.C. § 102(b).[6]

Both of these arguments incorrectly analyze the contents of tape 2 in isolation from the rest of the 3090 microcode. As the Court of Appeals for the Fourth Circuit has stated, "in reviewing a derivative work for originality, it is not sufficient to consider the matter by looking at the component parts: the work must be reviewed as a whole, not just reviewed or analyzed part by part." *M. Kramer Mfg. Co., Inc. v. Andrews*, 783 F.2d 421, 439 (4th Cir.1986).

The contents of tape 2 are instructions, software tools and data used in conjunction with or by the remainder of the 3090 microcode stored by IBM on tapes 1, 3, 4 and 5. Galler, Tr. at 1666–1667, 1669–1670; DX 5636. The 3090 microcode and the 3090 system cannot function properly without the tables, instructions and data stored on tape 2. Hogan, Tr. at 148; Belgard, Tr. at 1396–1397. At the same time, the 3090 system still could function properly if the 3090 microcode were compressed to fit on three or four tapes, and the contents of tape 2 stored on a tape with information currently stored on tapes 1, 3, 4 or 5. Granito, Tr. at 9–10; Hogan, Tr. at 142. IBM uses five tapes, rather than three or four, for the 3090 microcode for manufacturing convenience and to simplify system upgrades. Hogan, Tr. at 142. Moreover, when the 3090 microcode loads into the memory of the 3092 for execution, its arrangement bears no relationship to its segregation for archival purposes in tapes 1 through 5, so that the contents of tape 2 are scattered and intermingled with the rest of the 3090 microcode during the 3090 system's operation. Hogan, Tr. at 144–145; Galler, Tr. at 1673–1674. In short, the significance which AMI attaches to the storage of certain portions of the 3090 microcode on tape 2 alone is misplaced, since IBM has stored on tape 2 a substantial, necessary portion of a single work, the

---

**6.** AMI's Reply to Amended and Supplemental Counterclaims, Twentieth Separate Defense. § 102(b) provides:

[i]n no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

17 U.S.C.A. § 102(b) (1977).

3090 microcode.[7]

■ AMI also argues that by designing the 3090 system so that it cannot be modified without changing the 3090 microcode IBM improperly has attempted to use its copyright in the 3090 microcode to control the ability of 3090 system owners to use, modify and alter their machines. AMI argues that under 17 U.S.C. § 102(b) and *Baker v. Selden*, 101 U.S. 99, 25 L.Ed. 841 (1879), copyright protection should not be extended to the 3090 microcode because such protection would extend beyond expression to the utilitarian or idea.

The idea/expression distinction, as set forth by the Supreme Court in *Baker* and *Mazer v. Stein*, 347 U.S. 201, 74 S.Ct. 460, 98 L.Ed. 630 (1954), prohibits monopolization of an idea through copyright protection where there is only one or a limited number of ways to express the idea. This distinction is recognized in § 102(b) which, according to its legislative history, was intended "to make clear that the expression adopted by the programmer is the copyrightable element in a computer program, and that the actual processes or methods embodied in the program are not within the scope of the copyright law." H.R.Rep. No. 1476, 94th Cong., 2d Sess. 57, *reprinted in* 1976 U.S.Code Cong. & Ad.News 5659, 5670. The Court of Appeals for the Third

Circuit discussed the idea/expression distinction in *Apple Computer:*

> [the inquiry should] focus on whether the idea is capable of various modes of expression. If other programs can be written or created which perform the same function as an Apple's operating system program, then that program is an expression of the idea and hence copyrightable. In essence, this inquiry is no different than that made to determine whether the expression and idea have merged, which has been stated to occur where there are no or few other ways of expressing a particular idea.

714 F.2d at 1253.[8]

The evidence establishes that to perform the various processor controller functions and to enable the 3090 system to run IBM could have written the 3090 microcode in a number of ways other than the particular mode of expression it ultimately selected. Hogan, Tr. at 164; Belgard, Tr. at 1383, 1405–1410, 1420. For example, IBM: did not have to write the 3090 microcode as a table-driven program [9]; could have chosen to put different portions of the 3090 microcode in the form of a table; could have used an operating system other than VM in the 3090 microcode; or could have written the 3090 microcode in a programming language other than PL/S. Hogan, Tr. at

7. Accordingly, I need not reach the questions whether the contents of tape 2 viewed in isolation are sufficiently original to be copyrightable, and whether the alleged fact that tape 2 contains digital code renders it not copyrightable under § 102(b).

8. Congress established the National Commission on New Technological Uses of Copyright Works (CONTU) in 1974 to consider and make recommendations concerning, among other matters, the extent to which computer programs should be protected by copyright law. Because Congress adopted the recommendations of the majority of CONTU virtually unchanged, courts look to the CONTU final report as the legislative history of provisions recommended by CONTU. *See Apple Computer*, 714 F.2d at 1252.

The CONTU final report discusses the application of the idea/expression distinction to copyright protection for computer software:

> The "idea-expression identity" exception provides that copyrighted language may be copied without infringing when there is but a

limited number of ways to express a given idea. This rule is the logical extension of the fundamental principle that copyright cannot protect ideas. In the computer context this means that when specific instructions, even though previously copyrighted, are the only and essential means of accomplishing a given task, their later use by another will not amount to an infringement.

> . . . . .

> When other language *is* available, programmers are free to read copyrighted programs and use the ideas embodied in them in preparing their own works.

CONTU Final Report, at 20 (1979).

9. In a table-driven program like the 3090 microcode, information or data used repeatedly by different parts of the program is segregated into tables rather than represented in ordinary lines of code. Galler, Tr. at 1635–1636. The use of tables simplifies maintenance and modifications, and makes the program easier to understand. Hogan, Tr. at 145–146, 1559.

110–112, 147, 161–162; Galler, Tr. at 1671; Allen, Tr. at 1175–1176.

AMI argues that recognizing IBM's copyright on the 3090 microcode would extend protection to the idea underlying the 3090 microcode because AMI cannot reconfigure or split a 3090 system without an exact copy of the 3090 microcode for the particular configuration of the 3090 system AMI seeks to produce. AMI presented no evidence, however, to contradict the evidence presented by IBM that a computer program differing from the actual 3090 microcode in any or all of the ways noted above nevertheless could enable the 3090 system to operate.

▮ Whether it would be economically feasible for AMI to write its own program to perform the 3092 processor controller functions without copying any of IBM's 3090 microcode [10] is not relevant to the idea/expression distinction. Otherwise, a computer program so complex that vast expenditures of time and money would be required to develop a different program expressing the same idea would not be protected, even if innumerable different programs expressing that idea could be written, while a simpler program requiring less significant expenditures of time and money might be protected. So long as other expressions of the idea are possible, a particular expression of the idea can enjoy copyright protection, regardless of whether a copying party possesses the resources to write a different expression of the idea.[11]

▮ In addition, AMI suggests that this Court should analogize AMI's copying and modification of the 3090 microcode to permissible "repair" of patented machines, as recognized in *Wilbur–Ellis Co. v. Kuther,*

377 U.S. 422, 84 S.Ct. 1561, 12 L.Ed.2d 419 (1964) and *Everpure, Inc. v. Cuno, Inc.,* 875 F.2d 300 (Fed.Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989). AMI's Memorandum in Opposition to IBM's Post–Trial Memorandum of Law, at 17–27. The patent law doctrine of permissible repair "allows one lawfully using a patented combination to preserve and maintain the combination by making repairs or replacing unpatented component parts necessary for continued use." *Everpure,* 875 F.2d at 302–03.

Assuming that this doctrine could be applied to copyright law in some instances, I conclude that it cannot be applied to the alleged copyright infringement in the present case because the component part of the 3090 system that AMI has repaired or replaced is the copyrighted 3090 microcode. Courts have applied the doctrine of permissible repair only to repair or replacement of unpatented parts of a patented combination, not to repair or replacement of a patented component. *See, e.g., Wilbur–Ellis,* 377 U.S. at 423, 84 S.Ct. at 1562 ("We also put to one side the case where replacement was made of a patented component of a combination patent. We deal here with a patent that covered only a combination of unpatented components."); *Everpure,* 875 F.2d at 302–304 (holding that replacement of unpatented filter cartridge was not infringement of patent on filter unit of which cartridge was a component).

ii. *17 U.S.C. § 107*

▮ AMI contends that its copying of the 3090 microcode constituted fair use under § 107,[12] and therefore did not infringe

---

**10.** IBM presented evidence that the 3090 microcode, which is comprised of more than one million lines of code, was the product of approximately 1,500 person years of labor by IBM engineers and programmers. Granito, Tr. at 58; Hogan, Tr. at 1559.

**11.** *See Apple Computer,* 714 F.2d at 1253 ("If other methods of expressing [an] idea are not foreclosed as a practical matter, then there is no merger [of idea and expression]. Franklin may wish to achieve total compatibility with independently developed application programs written for the Apple II, but that is a commercial

and competitive objective which does not enter into the somewhat metaphysical issue of whether particular ideas and expressions have merged.")

**12.** AMI's Reply to Amended and Supplemental Counterclaims, Twenty–Second Separate Defense. § 107 provides:

Notwithstanding the provisions of section 106, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism,

IBM's copyright. Because "the fair use exception to the Copyright Act is an affirmative defense to a suit for copyright infringement, the party asserting the exception bears the burden of production and persuasion to show that the exception (and the defense) is applicable." *Association of American Medical Colleges v. Mikaelian,* 571 F.Supp. 144, 151 (E.D.Pa.1983), *aff'd,* 734 F.2d 3 (3d Cir.1984). Upon consideration of the four factors enumerated in § 107, I conclude that AMI has not established that its copying of the 3090 microcode constitutes fair use.

AMI's copying, both in accumulating its library of the 3090 microcode and in creating the 3090 microcode copies to be used on reconfigured or split 3090 systems, is purely for commercial purposes. As the Supreme Court has observed, "every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright." *Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 451, 104 S.Ct. 774, 793, 78 L.Ed.2d 574 (1984). Implying that this copying was for educational purposes, AMI argues that copying to build a library of different versions of the 3090 microcode was necessary in order to learn how to use the 3090 system and to discover how to support various configurations of the 3090 system. AMI's Memorandum in Opposition to IBM's Post–Trial Memorandum of Law, at 39–40. Since AMI built its library and sought to educate itself in order to achieve its commercial purposes without paying IBM, however, such copying was for commercial purposes and not for nonprofit educational purposes. *See Harper & Row v. Nation Enterprises,* 471 U.S. 539, 562, 105 S.Ct. 2218, 2231, 85 L.Ed.2d 588 (1985) ("[t]he crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price.")

The inquiry into the nature of the copyrighted work concerns whether the work is more informational than creative. *See Harper & Row,* 471 U.S. at 563, 105 S.Ct. at 2232 ("[t]he law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy.") Thus, courts consider "whether the work is imaginative and original, or whether it represented a substantial investment of time and labor made in anticipation of a financial return." *Hustler Magazine, Inc. v. Moral Majority, Inc.,* 796 F.2d 1148, 1154 (9th Cir.1986). As noted above, the 3090 microcode is the product of the substantial creative effort IBM made in anticipation of financial return when it sold 3090 systems. *See supra,* at 533, n. 10. Regardless of whether some portions of the 3090 microcode, such as tables listing the configuration of the 3090 system, might be primarily informational in nature, the 3090 microcode as a whole is a creative work.

In many instances, AMI has made a complete copy of the 3090 microcode, or has assembled and distributed a complete rainbow copy of the 3090 microcode from copies in its library. While such wholesale copying does not *per se* preclude a finding of fair use, it does "militate[ ] against a finding of fair use." *Hustler,* 796 F.2d at 1155. In other cases, AMI has copied only tape 2 of the five archival 3090 microcode tapes. As discussed above, the portion of the 3090 microcode stored on tape 2 is essential to the program's operation, and constitutes one-fifth of the entire 3090 microcode. *See supra,* at 531–532. When only a portion of a copyrighted work is copied, but the copied portion is a key or

comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C.A. § 107 (1977).

essential part of the copyrighted work, such copying is nevertheless substantial enough to militate against a finding of fair use. *See Harper & Row*, 471 U.S. at 564–565, 105 S.Ct. at 2232–33 (finding that verbatim copying of 300 to 400 words of a copyrighted book was copying of a substantial portion of the book, and therefore "evidence of the qualitative value of the copied material, both to the originator and to the plagiarist who seeks to profit from marketing someone else's copyrighted expression.")

Because AMI's copying of the 3090 microcode was for commercial purposes, the likelihood of future harm to the potential market for or to the value of the 3090 microcode may be presumed. *Sony*, 464 U.S. at 451, 104 S.Ct. at 793. Moreover, IBM presented evidence that it had lost revenues for each of the four splits of 3090 systems that AMI performed by making copies of the 3090 microcode. *See supra*, at 528–529, 529–530. If AMI continues to make copies of the 3090 microcode to perform splits of 3090 systems, such copies would fulfill demand for the original 3090 microcode from IBM, and therefore harm the work's potential market. *See Hustler*, 796 F.2d at 1155–1156.

AMI suggests that its copying activities are a form of reverse engineering permissible as fair use, and that the doctrine of fair use should permit AMI to take advantage of the technological advances which make exact duplication of various versions of the 3090 microcode possible. AMI's Trial Brief, at 8; AMI's Memorandum in Opposition to IBM's Post–Trial Memorandum of Law, at 27–29. According to the legislative history of § 107, the four enumerated factors are not an exhaustive list of the factors to be considered by courts in determining whether a certain form of copying constitutes fair use.[13]

Nevertheless, I reject AMI's contentions. The evidence presented establishes that AMI in fact has not engaged in reverse engineering, but rather has copied the 3090 microcode extensively to attempt to determine what patterns of copying would produce copies of the 3090 microcode that would operate various 3090 systems. By the same token, the fact that technological advances have made it easier for AMI to engage in its extensive copying activities provides no basis for finding these activities to be fair use, particularly considering AMI's commercial purpose for copying, the creative nature of the 3090 microcode, AMI's copying of the entire 3090 microcode or of a substantial portion thereof and the likelihood of harm to the market for and the value of the 3090 microcode.

### iii. *17 U.S.C. § 117*

AMI argues that its copying activities are permissible under § 117, a provision concerning permissible copying of computer programs added at the recommendation of CONTU.[14] As with § 107, AMI bears

---

**13.** The Report of the Committee on the Judiciary of the House states, in relevant part:

Although the courts have considered and ruled upon the fair use doctrine over and over again, no real definition of the concept has ever emerged. Indeed, since the doctrine is an equitable rule of reason, no generally applicable definition is possible, and each case raising the question must be decided on its own facts. On the other hand, the courts have evolved a set of criteria which, though in no case definitive or determinative, provide some gauge for balancing the equities. [four factors enumerated in § 107]

. . . . .

Beyond a very broad statutory explanation of what fair use is and some of the criteria applicable to it, the courts must be free to adapt the doctrine to particular situations on a case-by-case basis.

H.R.Rep. No. 94–1476, 94th Cong., 2nd Sess. 65–66, *reprinted in* 1976 U.S.Code Cong. & Ad.News 5659, 5679–5680.

**14.** AMI's Reply to Amended and Supplemental Counterclaims, Twenty–First Separate Defense. § 117 provides:

Notwithstanding the provisions of section 106, it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided:

(1) that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner, or

(2) that such new copy or adaptation is for archival purposes only and that all archival

the burden of establishing that the exception of § 117 applies. *Atari, Inc. v. JS & A Group, Inc.*, 597 F.Supp. 5, 10 (N.D.Ill. 1983). I conclude that even if AMI could establish that it is in the position of "the owner of a copy of a computer program" under § 117, it has failed to show that its copying of the 3090 microcode falls within either of the narrow definitions of permissible copying set forth in § 117.[15]

■ AMI's copying to accumulate a library of the 3090 microcode, or to make copies of the 3090 microcode for reconfigured or split 3090 systems, was not performed as "an essential step" in the use of the 3090 microcode with the 3090 system under § 117(1). As CONTU recommended in its final report,[16] § 117(1) permits only the copying of a program into a computer's memory in order to permit the computer to execute the program. *See Micro–Sparc, Inc. v. Amtype Corp.*, 592 F.Supp. 33, 34–35 (D.Mass.1984) ("In our opinion,

[§ 117(1)] refers to the placement of a program into a computer—or, in the jargon of the trade, the 'inputting' of it.... The permission to copy stated in subsection (1) is strictly limited to inputting programs.") In *Vault*, 847 F.2d at 261, upon which AMI primarily relies, the Court of Appeals for the Fifth Circuit held only that § 117(1) permits the loading of a program into a computer's memory even if the program was then analyzed in memory for a purpose unintended by the copyright owner. The *Vault* Court did not address the type of copying in which AMI has engaged, i.e. making copies on tape and on a hard disk to build a library of different versions of the program and to supply with a computer other than the one with which the program originally was supplied.

■ § 117(1) also permits adaptation of a program for use on a particular computer or to add features.[17] *See, e.g., Foresight*

---

copies are destroyed in the event that continued possession of the computer program should cease to be rightful.

Any exact copies prepared in accordance with the provisions of this section may be leased, sold, or otherwise transferred, along with the copy from which such copies were prepared, only as part of the lease, sale or other transfer of all rights in the program. Adaptations so prepared may be transferred only with the authorization of the copyright owner.

17 U.S.C.A. § 117 (Supp.1990).

As originally proposed by CONTU, § 117 granted rights to copy and adapt software to the "rightful possessor" of a program. When adopting § 117, Congress changed this provision to limit its scope to the "owner" of a program. CONTU Final Report, at 12; *Vault Corp. v. Quaid Software, Ltd.*, 847 F.2d 255, 260, n. 11 (5th Cir.1988).

**15.** Because, as discussed below, I find that AMI's copying does not fall within either of the two definitions of permissible copying in § 117, I do not decide the questions whether AMI stands in the position of "owner of a copy of a computer program" for the purposes of § 117, or whether the parties for whom AMI performs engineering services may delegate any rights they may have to copy or adapt under § 117 to AMI.

As AMI's copyright counsel has admitted, whether IBM has sold or merely licensed the 3090 microcode to purchasers of 3090 systems is immaterial to the question whether AMI could engage in its copying activity. Just as the pur-

chaser of a book is not free to make copies of the book to sell to others, so a purchaser of the 3090 microcode or another computer program could not make and sell copies from the original he or she had purchased. *See* Hearing of September 6, 1989, Tr. at 51.

**16.** The CONTU Final Report states, in relevant part:

Because the placement of a work into a computer is the preparation of a copy, the law should provide that persons in rightful possession of copies of programs be able to use them freely without fear of exposure to copyright liability.

. . . . .

One who rightfully possesses a copy of a program, therefore, should be provided with a legal right to copy it to that extent which will permit its use by that possessor. This would include the right to load it into a computer and to prepare archival copies of it to guard against destruction or damage by mechanical or electrical failure. ·But this permission would not extend to other copies of the program. Thus, one could not, for example, make archival copies of a program and later sell some while retaining some for use.

CONTU Final Report, at 13.

**17.** In its final report, CONTU recommended permitting limited adaptations by the owner:

[A] right to make those changes necessary to enable the use for which it was both sold and purchased should be provided. The conversion of a program from one higher-level lan-

*Resources Corp. v. Pfortmiller,* 719 F.Supp. 1006, 1009–1010 (D.Kan.1989) (holding that owner's enhancement of program exclusively for in-house use was an adaptation permissible under § 117). But AMI's modified versions of the 3090 microcode are not adaptations of the 3090 microcode permissible under § 117(1). The evidence establishes that AMI produces copies of the 3090 microcode for use on reconfigured or split 3090 systems by making rainbow copies from 3090 microcode copies taken from various 3090 systems, or by making changes in the 3090 microcode provided with one 3090 system to produce a partial duplicate of a copy from another system. *See supra,* at 529–530. Such activity is not permissible adaptation under § 117, since it produces modified 3090 microcode only by making partial duplicates of two or more different versions of the 3090 microcode produced by IBM.[18]

▇ Likewise, the 3090 microcode copies produced by AMI do not fall within the exception for archival copies set forth in § 117(2). A copy used for archival pur-

poses only, like the copy of the 3090 microcode IBM supplies on five tapes with each 3090 system for maintenance personnel, merely protects against the risk of loss of a program due to mechanical or electrical failure or some other form of destruction. *See Atari,* 597 F.Supp. at 9; CONTU Final Report, at 13. AMI's copies, however, perform functions in addition to archival functions. The evidence establishes that AMI produced copies of the 3090 microcode which actively operated reconfigured or split 3090 systems or served as standby backups in the 3370s for those systems, as well as copies which constituted its 3090 microcode library used in making copies for 3090 systems. *See supra,* at 529–530. The copies produced by AMI therefore fall outside of § 117(2), which protects solely those copies used "for archival purposes *only*" (emphasis added).[19]

### iv. *17 U.S.C. § 109*

▇ AMI suggests that the doctrine of exhaustion codified in § 109 permits AMI to engage in its copying activities to recon-

---

guage to another to facilitate use would fall within this right, as would the right to add features to the program that were not present at the time of rightful acquisition.

. . . . .

Preparation of adaptations could not, of course, deprive the original proprietor of copyright in the underlying work. The adaptor could not vend the adapted program, under the proposed revision of the new law, nor could it be sold as the original without the author's permission.

CONTU Final Report, at 13.

18. No evidence was presented that AMI had made adaptations to the 3090 microcode for a 3090 system without copying in one way or another the 3090 microcode supplied with at least one other 3090 system. Adaptations produced without such copying might be permissible under § 117, though I do not resolve that question, since the circumstances of this case do not require me to do so. Whether or not it is feasible economically for AMI to perform reconfigurations and splits if required to modify the 3090 microcode by trial and error without duplicating other copies is irrelevant to the question of what is a permissible adaptation under § 117.

For the purposes of § 117, there is no distinction to be drawn between copying a portion of the 3090 microcode by electronic or magnetic

duplication, and by comparing two copies of the 3090 microcode and manually changing those portions of the first differing from the second. These methods, both of which have been employed by AMI, differ merely in the speed and ease with which they produce copies. *See* Allen, Tr. at 1015–1028; AMI's Post–Argument Memorandum, at 3.

19. Professor Arthur Miller, who was a member of CONTU, testified concerning CONTU's intent in drafting § 117 in general, and in permitting the production of archival copies in particular. While I have doubts about the propriety of relying on testimony of a member of the committee which drafted a statute for guidance in interpreting that statute, I do note that Miller's testimony supports my interpretation of the term "archival." Miller testified that by permitting archival copies, CONTU intended to permit a lawful possessor (changed by Congress to "owner") to protect itself against destruction of the original copy of a program. He said that CONTU's image of archival copies only included copies on a figurative or literal "shelf", not copies connected to a computer as either active or "hot standby" copies performing some live function and subject to the risk of destruction. Miller, Tr. at 1487–1489. Miller also said that he believed using copies of a program stored in a library in order to make other copies of the program for use on other computers was not

figure 3090 systems.[20] However, even if AMI could establish that IBM sold copies of the 3090 microcode as part of the 3090 system, § 109 would not permit AMI's copying activities. As the District Court for the Northern District of Illinois stated in *Midway Mfg. Co. v. Strohon,* 564 F.Supp. 741, 745 (N.D.Ill.1983), "[s]ection 109 does not authorize adaptation and reproduction of a copyrighted work." As noted above, no evidence was presented that AMI ever has modified the 3090 microcode supplied with a 3090 system which AMI reconfigured or split without copying at least a portion of the 3090 microcode supplied with one or more other 3090 systems.

### v. Consent Decree

AMI contends that IBM is estopped from asserting its counterclaim for copyright in-

fringement by its violations of various provisions of the Consent Decree in *United States v. IBM,* No. 72–344, 1956 Trade Cas. (CCH) ¶ 68,245 (S.D.N.Y. January 25, 1956).[21] The Consent Decree requires IBM to take various actions and to refrain from various activities relating to the lease or sale of tabulating machines and electronic data processing machines and systems. AMI concedes that as a non-party to the Consent Decree it cannot attempt to enforce the Decree's provisions against IBM. AMI nevertheless asserts as a defense that IBM is estopped from pursuing a copyright infringement counterclaim against AMI because of IBM's violations of the Decree.[22]

AMI argues that IBM has violated a number of Consent Decree provisions [23] including, in AMI's view: an injunction in Section VII(d)(2) and (3) against subjecting to IBM control or approval alterations in,

---

using the library copies for an archival purpose. Miller, Tr. at 1490.

**20.** AMI's Memorandum in Opposition to IBM's Post–Trial Memorandum of Law, at 38. § 109(a) provides:

> Notwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord. 17 U.S.C.A. § 109(a) (1977).

**21.** The United States filed an antitrust action against IBM in the District Court for the Southern District of New York in 1952, alleging violations of Sections 1 and 2 of the Sherman Act. The United States and IBM negotiated the Consent Decree to end the antitrust action. Since the Court approved the Decree, it has been modified only once, on December 29, 1970, to incorporate the provisions of the Uniform Commercial Code following the Code's adoption by the state of New York. DX 4444, at 36–41.

The Computer Dealers and Lessors Association, Inc. ("CDLA") has submitted two post-trial briefs as *amicus curiae* concerning the Consent Decree. AMI has stated that it "is in accord" with the CDLA's contentions regarding the Consent Decree. AMI's Memorandum in Opposition to IBM's Post–Trial Memorandum of Law, at 1. For the sake of simplicity, within this section I will refer to the arguments advanced by both the CDLA and AMI as the arguments of AMI.

**22.** *See* Order of October 17, 1989, at 1, n. 1.

AMI previously sought leave to supplement its complaint in this action to add counts seeking declaratory judgments regarding various alleged violations of the Consent Decree. I denied AMI's motion regarding these counts, holding that to the extent they were not redundant of AMI's Consent Decree defenses, these counts sought impermissible offensive use of the Decree. *See* Order of December 1, 1989, at 2–3.

**23.** AMI contends that the 3090 system is encompassed in the Consent Decree's definitions of electronic data processing systems and machines. Section II of the Consent Decree, which defines a number of terms used in the Decree, provides, in relevant part:

> (e) "Electronic data processing system" shall mean any machine or group of automatically intercommunicating machine units capable of entering, receiving, storing, classifying, computing and/or recording alphabetic and/or numeric accounting and/or statistical data without intermediate use of tabulating cards, which system includes one or more central data processing facilities and one or more storage facilities, and has either
>
> (1) the ability to receive and retain in the storage facilities at least some of the instructions for the data processing operations required, or
>
> (2) means, in association with storage, inherently capable of receiving and utilizing the alphabetic and/or numeric representation of either the location or the identifying name or number of data in storage to control access to such data, or
>
> (3) storage capacity for 1,000 or more alphabetic and/or decimal numeric characters or the equivalent thereof.

attachments to or experimentation with 3090 systems;[24] a prohibition in Sections IV(b) and VI(c) against engaging in a lease-only policy regarding 3090 systems by providing the 3090 microcode to lessees to support reconfigurations or alterations without charge, but refusing to provide the 3090 microcode without charge to 3090 system owners;[25] a requirement to offer the 3090 microcode for sale at reasonable and nondiscriminatory prices under Sections

(f) "Electronic data processing machine" shall mean a machine or device and attachments therefor used primarily in or with an electronic data processing system.

1956 Trade Cas. (CCH), at 71,122.

**24.** AMI's Reply to Amended and Supplemental Counterclaims, Twelfth Separate Defense. Section VII(d) of the Consent Decree provides:

IBM is hereby enjoined and restrained from:

(1) requiring any lessee or purchaser of an IBM tabulating or electronic data processing machine to purchase tabulating cards from IBM or directly or indirectly discriminating against any such person by reason of the fact that cards not manufactured by IBM are used,

(2) prohibiting, or in any way subjecting to IBM control or approval, experimentation with such machine, or

(3) prohibiting, or in any way subjecting to IBM control or approval, alterations in or attachments to such machine;

provided, however, that this Section VII(d) shall not be construed to restrain IBM from including in any agreement with any lessee of such a machine provisions reasonably designed to prevent such interference with the normal and satisfactory operation and maintenance of such machine as will substantially increase the cost of maintenance thereof.

1956 Trade Cas. (CCH), at 71,124–71,125.

**25.** AMI's Reply to Amended and Supplemental Counterclaims, Fifteenth Separate Defense. Section IV(b) of the Consent Decree provides:

IBM is hereby ordered and directed, beginning not later than one year after the entry of this Final Judgment, to offer

(1) to sell, at any time during the period of 18 months next thereafter, to the lessee of any IBM tabulating or electronic data processing machine each such machine being used by such lessee;

(2) to sell new standard tabulating and electronic data processing machines of each type at any time thereafter currently being manufactured and offered for lease or sale by IBM; and

(3) to sell any new special purpose tabulating or electronic data processing machine to the user for whom it has been designed and produced by IBM.

1956 Trade Cas. (CCH), at 71,123.

IV(b)(2), VI(c) and VII(d)(2) and (3);[26] and a requirement under Sections IX(b) and (c) to furnish a copy of the 3090 microcode to 3090 system owners at cost.[27] IBM argues that the Consent Decree does not apply to an attempt by IBM to enforce its copyright in computer software, that AMI has not established the elements of an estoppel defense based on the Consent Decree, and that IBM has not violated the Consent Decree.

Section VI of the Consent Decree provides, in relevant part:

IBM is hereby ordered and directed:

. . . . .

(c) to offer to sell at reasonable and nondiscriminatory prices and terms, to owners of IBM tabulating or electronic data processing machines (whether or not the purchaser receives IBM repair and maintenance service) and to persons engaged in the business of maintaining and repairing such machines and during the period when IBM has such parts and subassemblies available for use in its leased machines, repair and replacement parts and subassemblies for any tabulating machines or electronic data processing machines manufactured by IBM.

1956 Trade Cas. (CCH), at 71,124.

**26.** AMI's Reply to Amended and Supplemental Counterclaims, Fourteenth Separate Defense.

**27.** AMI's Reply to Amended and Supplemental Counterclaims, Sixteenth Separate Defense. Section IX provides, in relevant part:

IBM is hereby ordered and directed:

. . . . .

(b) Upon written request to furnish, at reasonable and nondiscriminatory charges made to reimburse IBM for the cost of furnishing them, to any owner of an IBM tabulating or electronic data processing machine and to any person eligible to receive training pursuant to paragraph (a) of this Section IX copies of any technical manuals, books of instruction, pamphlets, diagrams or similar documents, which it furnishes generally to its own repair and maintenance employees relating to tabulating or electronic data processing machines and which pertain to such training.

(c) Upon written request to furnish, on a nondiscriminatory basis, without charge or at a reasonable charge made to reimburse IBM for the cost of furnishing them, to purchasers and lessees of IBM tabulating machines and electronic data processing machines, copies of manuals, books of instruction, pamphlets, diagrams, or similar documents which pertain to the operation or application of such machines owned or leased by such purchasers or lessees.

To establish a defense of estoppel based on alleged violations of the Consent Decree, AMI must show that: IBM has violated its obligations under the Consent Decree and IBM thereby has lost its right to assert a claim of copyright infringement against AMI because IBM "caused or brought about" AMI's infringement. *Broadcast Music, Inc. v. CBS, Inc.*, 221 U.S.P.Q. 246, 254, 1983 WL 1136 (S.D.N.Y.1983). If these elements are established, to hold that a party is estopped from asserting its claim of copyright infringement "is merely an application of the ancient equitable doctrine of 'unclean hands.'" *Tempo Music, Inc. v. Myers*, 407 F.2d 503, 507 (4th Cir.1969).

I find that insofar as AMI has engaged in unauthorized copying to support reconfigurations of 3090 systems AMI has failed to establish that IBM "caused or brought about" such activity. To the extent that AMI has made unauthorized copies of the 3090 microcode in order to perform splits, I find that IBM has violated Section VII(d)(3) of the Consent Decree in its pricing of the 3090 microcode necessary to perform splits and that IBM "caused or brought about" such activity by AMI.[28]

### a. *AMI's Copying in Support of Reconfigurations*

■ To establish an estoppel defense based on the Consent Decree, AMI must demonstrate not only that IBM violated its obligations under the Decree but also that IBM "caused and brought about" AMI's unauthorized copying. For example, in

*Tempo* the Court of Appeals for the Fourth Circuit found that ASCAP was estopped from bringing a copyright infringement action against the owner of a club at which ASCAP songs were performed without authorization. The Court found that ASCAP had violated its obligations under a consent decree by failing to reply to defendant's request for a list of ASCAP songs and stated that "we think it would be inequitable to permit these plaintiffs to recover for the infringement which occurred and which was caused and brought about, in part at least, by the dereliction of ASCAP in failing to facilitate [the defendant's] expressed intention of avoiding infringement." 407 F.2d at 507.

In *Broadcast Music*, the Southern District of New York held that CBS could not assert that BMI's copyright infringement action was equitably estopped as a violation of a consent decree because CBS could not establish that BMI caused the infringement by CBS. The Court distinguished the situation in *Tempo:*

Unlike *Tempo*, this cannot fairly be characterized as a situation in which BMI seeks to recover for an infringement it "caused and brought about." Rather, both parties ... have assumed adamant legal positions and have acted in accordance with their perceived rights. The direct casual (sic) link between plaintiff's allegedly improper conduct and the relief it seeks, characteristic of the classic "unclean hands" case, is absent here.

1956 Trade Cas. (CCH), at 71,126.

**28.** When AMI sought leave to supplement its complaint in 1988 with, among other counts, a claim that IBM had violated the Consent Decree, I placed this action in suspense to allow the parties to seek an interpretation of the Consent Decree from the Court which had approved and retained jurisdiction over it. *See* this Court's Order of October 6, 1988; Consent Decree, Section XIX, 1956 Trade Cas. (CCH), at 71,131. AMI then filed a declaratory judgment action concerning the Consent Decree in the District Court for the Southern District of New York. The Court dismissed AMI's declaratory judgment action on June 20, 1989, stating:

Duplicative proceedings would neither conserve judicial resources nor expedite this matter. Moreover, the Eastern District of Pennsylvania is readily able to determine whether AMI has standing to enforce or seek a con-

struction of the Decree as well as to interpret the decree.... This Court declines to exercise jurisdiction over this action because it is not an appropriate action for declaratory judgment.

*AMI v. IBM*, 714 F.Supp. 707, 709 (S.D.N.Y. 1989).

After the Southern District of New York dismissed AMI's declaratory judgment action, I removed this action from the suspense file. *See* this Court's Order of June 30, 1989.

I have been informed that AMI has made a complaint to the United States Department of Justice regarding IBM's 3090 microcode practices and the Consent Decree, and that the Department has stated its position regarding these issues in a letter dated April 13, 1990. PX 1383. I have not relied in any way on the Department's letter in reaching my conclusions concerning the Consent Decree.

221 U.S.P.Q. at 225 (citations omitted).

AMI contends that IBM caused AMI's infringement in copying the 3090 microcode to support reconfigurations, including building AMI's 3090 microcode library, because it is impossible to reconfigure a 3090 system without copying and changing the 3090 microcode. As in *Broadcast Music,* however, I find that IBM has not "caused or brought about" AMI's infringement to support reconfigurations. The evidence was that anyone, including AMI, can obtain a copy of the 3090 microcode from IBM to support a reconfiguration for between $420 and $2100, depending upon the number of 3090 microcode tapes which must be changed. Moreover, I find that the evidence established that IBM has supplied the 3090 microcode quickly enough to satisfy AMI's requests, as well as of other parties who have placed orders. *See supra,* at 528. According to the chairman of Comdisco and of the CDLA Ad Hod Committee on Microcode, a delivery schedule of less than 14 days would suffice to meet the needs of companies which own 3090 systems and lease them to others. Pontikes, Tr. at 853–854; DX 4471.

AMI contends that it could not obtain copies of the 3090 microcode from IBM during 1989 and thus could not satisfy its customers' requirements. AMI's Memorandum in Opposition to IBM's Post–Trial Memorandum of Law, at 9. The only evidence cited in support of this contention is a memo referring to a statement apparently made by an employee of Data Hardware, a competitor of AMI's, that IBM's lead times in supplying the 3090 microcode "do not come close to meeting [Data Hardware's] needs." AMI's Memorandum in Opposition to IBM's Post–Trial Memorandum of Law, at 9; PX 1004. This statement does not establish that IBM provided 3090 microcode unreasonably slowly to Data Hardware. Moreover, because this statement obviously does not concern AMI's 3090 microcode needs, it does not establish that IBM provided 3090 micro-

code to AMI so slowly that AMI was forced to make copies.

AMI President Allen also testified that when AMI ordered 3090 microcode from IBM, the 3090 microcode was delivered "late" or was "wrong." Allen, Tr. at 1079–1080. To the extent that Allen's testimony contradicts the testimony of Larry Bigando, the program manager for the IBM department which ships 3090 microcode tapes, I credit Bigando's testimony. *See supra,* at 528. Bigando's testimony was supported by the statistics IBM compiled concerning 3090 microcode orders during 1988 and 1989, while Allen's statement was unsupported.

In short, I find that AMI has failed to establish that IBM caused it to make unauthorized copies of the 3090 microcode to support reconfigurations, because IBM has provided the required 3090 microcode with sufficient speed and for a reasonable handling charge.[29]

b. *AMI's Copying to Perform Splits*

▮ AMI contends that IBM's violations of a number of provisions of the Consent Decree prevent IBM from maintaining its claim with respect to AMI's copying to split 3090 systems (which includes any copying to build AMI's 3090 microcode library to the extent that such copies necessarily were used in performing splits). I will discuss each of the Consent Decree provisions relied upon by AMI in turn.

▮ As the Court of Appeals for the Third Circuit has observed, "[a]lthough consent decrees are judicial acts, they have many of the attributes of contracts voluntarily undertaken, and are construed according to traditional precepts of contract construction." *Fox v. United States Department of Housing and Urban Development,* 680 F.2d 315, 319 (3d Cir.1982). Accordingly, in interpreting a consent decree a court's "first resort is to the four corners of the agreement." *Halderman v. Penn-*

---

**29.** Because I find that AMI has not established that IBM "caused or brought about" AMI's infringement to support reconfigurations, I need not address the question whether IBM has violated any provisions of the Consent Decree with respect to AMI's copying to support reconfigurations.

*hurst State School and Hospital,* 901 F.2d 311, 319 (3d Cir.1990) (citing *United States v. Armour & Co.,* 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971); *Fox,* 680 F.2d at 319). A court may not attempt to discern a consent decree's scope by reference to the purposes of the plaintiff in initiating the litigation concluded by the consent decree, since

> the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve.

*Armour,* 402 U.S. at 681–682, 91 S.Ct. at 1757.

The "four corners" rule does not, however, limit a court's interpretation to a consent decree's explicit provisions if it is ambiguous. *Fox,* 680 F.2d at 319. In addition, the Supreme Court has stated that in interpreting a consent decree,

> reliance upon certain aids to construction is proper, as with any other contract. Such aids include the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree. Such reliance does not in any way depart from the "four corners" rule of *Armour.*
>
> *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975).

AMI asserts that IBM violated a prohibition in Sections IV(b) and VI(c) against engaging in a lease-only policy regarding 3090 systems by providing the 3090 microcode to lessees to support reconfigurations or alterations without charge, but refusing to provide the 3090 microcode without charge to 3090 system owners. No evidence was presented to support this allegation.

AMI asserts that IBM violated a requirement under Section IX(b) and (c) to furnish a copy of the 3090 microcode to 3090 sys-

tem owners at cost. Section IX(b) and (c) require IBM to furnish computer owners with technical and instructional manuals and documents pertaining to the operation or repair of their machines. These provisions are unambiguous, and in no sense address or concern computer hardware or software, including the 3090 microcode.

AMI also asserts that IBM violated a requirement to offer the 3090 microcode for sale at reasonable and nondiscriminatory prices under Sections IV(b)(2) and VI(c).[30] Section VI(c) requires IBM "to offer to sell at reasonable and non-discriminatory prices and terms ... repair and replacement parts and subassemblies." To the extent that AMI copies the 3090 microcode because it believes that IBM's prices for 3090 microcode to perform splits are unreasonable, such copying cannot be justified by Section VI(c). AMI's copying to perform splits produces two copies of the 3090 microcode in addition to the two copies· supplied with the original split 3090 system. *See supra,* at 528, 529–530. These new copies of the 3090 microcode, used on one of the two new systems resulting from the split, cannot be "repair" or "replacement" parts or subassemblies for a machine.

Section IV(b)(2) requires IBM to sell any "electronic data processing machines" currently manufactured and offered for lease by IBM. The 3090 microcode, while a necessary element of the 3090 system, is not in and of itself an "electronic data processing machine" as that term is defined in Section II(f). Moreover, IBM does not lease the 3090 microcode, but rather licenses the use of the 3090 microcode under the Licensed Internal Code provision of the Purchase Agreement. *See supra,* at 527, n. 3.

AMI's primary Consent Decree defense is that IBM has violated the injunction in Section VII(d)(2) and (3) against "prohibiting, or in any way subjecting to IBM control or approval" alterations in, attachments to or experimentation with 3090 systems. According to AMI, IBM violates the

---

**30.** In its Fourteenth Separate Defense, AMI also asserts that this requirement is established by Section VII(d)(2) and (3). This provision is discussed below.

Consent Decree "by seeking to retain title to a machine part it is required to sell and by employing its 3090 microcode copyright as a means to control or prevent its customers' machine alterations." AMI's Memorandum in Opposition to IBM's Post–Trial Memorandum of Law, at 9. I conclude that IBM's effort to enforce its copyright in the 3090 microcode is not in and of itself a violation of Section VII(d)(2) or (3). Section VII(d)(2) and (3), if read in isolation, could be read to divest IBM of all its intellectual property rights in the parts of its computers. Because the Consent Decree is a contract, however, its provisions cannot be read in isolation from one another, but must be read in the context of the Decree as a whole. If, as AMI contends, Section VII(d)(2) and (3) deprived IBM of all its intellectual property rights over parts of computers, there would be no need for the patent licensing provision of Section XI.[31]

I nevertheless conclude that the splits of 3090 systems which AMI performs are encompassed by Section VII(d)(3) as "alterations" to such systems, and that IBM violated Section VII(d)(3) by attempting to prohibit splits or subject them to its control or approval through its pricing of the 3090 microcode necessary to perform splits.

As with reconfigurations, IBM offers to supply copies of the 3090 microcode to AMI and others to support splits of 3090 systems. The evidence establishes that although IBM seeks to recover microcode development costs in its charge for 3090 microcode to perform splits[32] it does not charge the same amount for microcode for all splits. Rather, IBM sets the price for the 3090 microcode for a given split at a level designed to reduce or eliminate any economic incentive to perform the split.[33]

For example, IBM charges $333,000 for the 3090 microcode to split a 400E into two 200Es, because two 200Es sell for $4,500,000 each, or a total of $9,000,000, and a 400E plus the hardware required to split it into two 200Es costs only $8,654,000.[34] IBM's Enterprise Systems Financial Analysis Director and the Senior Vice President and General Manager of IBM Enterprise Systems both testified that IBM set the price to supply the 3090 microcode necessary to perform this split at a price that closes the gap between the price of the original 400E and the two 200Es resulting from the split. Conti, Tr. at 194–195; Dellasega, Tr. at 585; DX 4379. IBM submitted evidence concerning two other splits for each of which IBM charges a different price to supply supporting copies of the 3090 microcode: to split a 280E into two 180Es, $245,000; and to split a 400S into two 200Ss, $350,000. Dellasega, Tr. at 586–590; DX 4381; DX 4383.

IBM presented the testimony of Professor Almarin Phillips, who studied IBM's pricing of the 3090 family. He stated that IBM set its prices with two constraints in mind: an upper limit imposed by competi-

---

**31.** I need not determine whether IBM must sell, or can merely license, the 3090 microcode since neither a purchaser nor a licensee is entitled to make and sell or distribute copies. *See supra,* at 536, n. 15.

**32.** IBM seeks to recover costs associated with the development of the 3090 microcode in the price it charges for 3090 microcode to support splits but not reconfigurations. Dellasega, Tr. at 576–577, 598–599. IBM does not seek to recover microcode development costs in supplying the 3090 microcode for reconfigurations because it already has done so once when the 3090 system initially was sold; IBM does seek to recover development costs for an additional system in supplying the 3090 microcode for splits because a split produces two systems from one, and IBM has recovered the costs attributed to

only the one system originally sold and thereafter split. Dellasega, Tr. at 576–579, 598–599.

**33.** The price gap between what IBM charges for the original 3090 system and the two 3090 systems resulting from the split provides the economic incentive to perform splits, and creates the possibility of lost revenue for IBM which is referred to within IBM as the "arbitrage risk". Dellasega, Tr. at 584–585.

**34.** Because of competition, IBM must sell 3090 system computers at prices commensurate with their performance. Thus, IBM sells a 400E, which processes at 59 Millions of Instructions Per Second (MIPS), for $8,375,000, and a 200E, which processes at 33 MIPS, at $4,500,000, even though a 400E is essentially two 200Es with additional hardware and copies of the 3090 microcode. *See supra,* at 528–529.

tion and the desire to limit others' ability to take advantage of price differentials through splits, thereby maintaining IBM profit levels. About the latter constraint he said:

> part of the investment made in the 3090 family, and not totally peculiar to 3090 but in the extreme in 3090, was investing in an ability to move one type of 3090 computer to another type of 3090 computer, which created arbitrage capabilities. In order for IBM then to be able to realize in the market what the market would permit it to get through the competitive process, it had to impose another set of constraints, some internal constraints, to prevent others from arbitraging across particular types of computers in ways which would make that recovery impossible.

Phillips, Tr. at 1439.

Similarly, in discussing the price differential between a 400E and two 200Es, Phillips said: "To close that, IBM prices the RPQ at $350,000,[35] effectively saying this is an arbitrage route that we would like not to have open because it would undermine our ability to price appropriately in the competitive marketplace." Phillips, Tr. at 1443.

The four splits which AMI performed, and which are the subject of IBM's copyright infringement counterclaim, were of a 400E into two 200Es. I conclude that by setting the price of the microcode for this type of split at a level which eliminated any economic incentive to perform splits IBM violated Section VII(d)(3); by this structure IBM prohibited splits, or at least subjected splits to its control or approval. I also find that in adopting such a pricing structure, IBM "caused or brought about" AMI's copying activity and infringement to perform splits. Due to IBM's pricing, AMI could perform splits only if it produced copies of the 3090 microcode to use on the machines resulting from the splits.

Although it contains provisions concerning patents, the Consent Decree does not contain any specific provisions concerning computer software or copyrights. Consent Decree, Sections XI–XIII, 1956 Trade Cas. (CCH), at 71,127–71,129. As IBM points out, when the Consent Decree was entered in 1956, the Copyright Office did not accept computer software for registration.[36] IBM argues that therefore copyrighted software is beyond the bounds of the Consent Decree and that the Consent Decree could apply to its counterclaim only if the Decree had been modified by the United States or if this Court impermissibly goes beyond the "four corners" of the Decree. I disagree.

IBM does not dispute that the Consent Decree's definitions of "electronic data processing system" and "electronic data processing machine" encompass the 3090 computer system and its hardware. IBM's Post–Trial Memorandum of Law, at 60. Nor does IBM dispute that in order to split a 3090 system the 3090 microcode for that system must be changed and copied. *See supra,* at 528. The restraint set forth in Section VII(d)(3) is unambiguous and broad; it enjoins IBM from "prohibiting, or in any way subjecting to IBM control or approval" alterations in or attachments to an electronic data processing machine. No modification of this language is necessary to encompass an attempt to subject 3090 system splits to IBM control or approval, or to prohibit them, through pricing of intellectual property protected by copyright. There is no basis for reading into this broad language, as IBM would, a limitation applying the injunction to only those methods of prohibiting alterations or subjecting them to IBM control or approval which existed in 1956.

Relying primarily on *Fox* and *Kittitas Reclamation District v. Sunnyside Valley Irrigation District,* 626 F.2d 95 (9th Cir. 1980), *cert. denied,* 449 U.S. 1079, 101 S.Ct. 861, 66 L.Ed.2d 802 (1981), IBM argues that the recognition of copyrights in software is a development subsequent to the entry of the Consent Decree which there-

---

**35.** Phillips later stated that IBM's price for the 3090 microcode alone to split a 400E into two 200Es is $333,000. Phillips, Tr. at 1443.

**36.** The Copyright Office first accepted computer programs for registration as works under its "rule of doubt" in 1964. W. Patry, *Latman's The Copyright Law* 59 (6th ed. 1986).

fore cannot be encompassed by the Decree. In *Kittitas*, the Court of Appeals for the Ninth Circuit affirmed the district court's decision that a consent decree's definition of the term "total water supply available" was ambiguous. In holding that dead storage water was not encompassed by this term, the Court explicitly relied on the fact that dead storage water was not practically available until 23 years after entry of the decree. 626 F.2d at 98–99. In contrast to the decree at issue in *Kittitas*, Section VII(d)(3)'s injunction, while broad, is nevertheless unambiguous. The parties evidently contemplated enjoining "any way" of prohibiting machine changes or subjecting them to IBM control or approval, including methods which did not become available until after the decree's entry.

The *Fox* Court held that the district court had erred in interpreting the parties' obligations under a consent decree; according to the Court, the requirement that the parties must "use their best efforts to obtain approvals necessary to effectuate the terms of this settlement" did not include an obligation to provide financing because other provisions of the consent decree explicitly set forth the parties' funding obligations. 680 F.2d at 320–321. The *Fox* Court found that subsequent changes in conditions making an additional funding obligation upon one party attractive to the other did not warrant an expansion of the parties' funding obligations over those ex-

plicitly established in the decree. Since VII(d)(3) of the present Decree is broad but explicit, the *Fox* case provides no basis for finding that the Consent Decree cannot apply to copyrighted software.

As IBM notes, Section VII(d) permits IBM to include in its lease agreements provisions "reasonably designed to prevent such interference with the normal and satisfactory operation and maintenance of such machine as will substantially increase the cost of maintenance thereof." 1956 Trade Cas. (CCH), at 71,125. This limitation on IBM's obligations plainly applies only to agreements by which IBM leases a machine,[37] and is not relevant here. IBM also refers to Section VI(b) of the Consent Decree, which permits IBM to refuse to provide maintenance services for machines altered in a way which makes maintenance impractical.[38] In order to determine whether IBM is estopped from asserting its copyright infringement action by its violation of Section VII(d)(3), I need not decide whether Section VI(b) requires IBM to certify for IBM maintenance 3090 systems split by AMI with copied 3090 microcode. Accordingly, I express no opinion regarding Section VI(b).

IBM suggests that, if it cannot price the 3090 microcode for splits as it has, customers are likely to purchase larger computers like the 400E and split them, causing lost revenue to IBM and a corresponding reduction in the recovery of IBM's investment in

---

**37.** At the hearing in 1956 in which the Consent Decree was submitted for approval to the Southern District of New York, the Assistant Chief of the Judgments and Judgment Enforcement Section of the Antitrust Division of the Justice Department outlined for the Court various provisions of the Consent Decree. Concerning this provision of Section VII(d) he stated:

But in the proviso on page 14 it does reserve to IBM the privilege to insert in an agreement for lease, lease only, provisions which are reasonably adapted to prevent such an interference with the normal and satisfactory operation and maintenance of the machine as will substantially increase the cost of maintenance thereof, the reason for that being that, of course, under a lease agreement IBM undertakes continuing responsibility for the maintenance and repair of the machine. PX 1507, at 75.

**38.** Under Section VI(b), IBM is ordered and directed:

to offer, commencing one year after the entry of this Final Judgment and so long thereafter as IBM shall continue to render repair and maintenance service, to maintain and repair at reasonable and non-discriminatory prices and terms IBM tabulating and electronic data processing machines for the owners of such machines; provided that, if any such machine shall be altered, or connected by mechanical or electrical means to another machine, in such a manner as to render its maintenance and repair impractical for IBM personnel having had the standard training and instruction provided by IBM to such maintenance and repair personnel, then IBM shall not be required by this Final Judgment to render maintenance and repair service for such IBM machine. 1956 Trade Cas. (CCH), at 71,124.

the development of the 3090 system and of the 3090 microcode. IBM's Post–Trial Memorandum of Law, at 68. I need not decide whether IBM would be estopped from asserting its counterclaim if it could establish that its pricing structure is necessary to ensure that IBM recovers its development costs; IBM has failed to establish that this pricing structure was necessary. The only evidence IBM introduced concerning recovery of its costs in the charge for the 3090 microcode was that 74% of each dollar of revenue is earmarked to recover costs. Dellasega, Tr. at 583. IBM produced no evidence of how it calculated this recovery figure, whether it includes costs of development of the entire 3090 system or just of the 3090 microcode; or even what the exact development cost of the 3090 microcode was. Thus, I find that IBM has failed to establish that it is necessary for IBM to set the price for the 400E/200E split at $333,000 in order to recover its development costs.

IBM argues that, because of competitive concerns, it cannot eliminate the risk of "arbitrage" except by charging for the 3090 microcode a price which eliminates the difference in price between the original 3090 system and the two resulting from the split. According to IBM, the pressure of competition prevents it from eliminating this differential in the 400E/200E situation either by raising the price of a 400E or by lowering the prices of 200Es, since the prices of both these systems are commensurate with their level of performance. Conti, Tr. at 196–197; Dellasega, Tr. at 585. This commercial and competitive objective is irrelevant. It is IBM's attempt to eliminate the risk of "arbitrage" through the pricing of the 3090 microcode, which violated the Consent Decree and has "caused or brought about" AMI's infringement. Professor Phillips testified that IBM's purpose in eliminating the risk of "arbitrage" is "to be able to realize in the market what the market would permit it to get through the competitive process." See supra, at 544. But IBM's pricing policy for 3090 microcode to perform splits, no matter how desirable economically from IBM's point of view, violated the Consent

Decree and "caused or brought about" AMI's infringement because it admittedly had the purpose of eliminating splits.

IBM contends that its pricing to lessen or eliminate the possibility of "arbitrage" was approved by this Court in the first phase of this case regarding net priced upgrades for 308X systems. Phillips, Tr. at 1439–1441; DX 5621. In my opinion concerning AMI's Section 1 Sherman Act claim against IBM, when discussing the cross-elasticity of demand for upgrades and for 308X computers, I noted that "IBM set its net upgrade prices to equal the price differentials of its 308X computers so that customers would not buy one product at the exclusion of the other." 693 F.Supp. at 282. I held that this practice did not constitute an unreasonable restraint of trade, and therefore did not violate the Rule of Reason and the Sherman Act: "IBM's OTC pricing structure provided a reasonable mechanism to facilitate IBM's recovery of its substantial investment in 308X technology." 693 F.Supp. at 297.

Thus, my "approval" of such a pricing structure was merely a holding that it did not violate the antitrust laws. The present inquiry concerning IBM's pricing of the 3090 microcode for the application of AMI's Consent Decree defense is entirely separate from the inquiry with respect to the Rule of Reason under the Sherman Act.

Relying on *Tempo*, IBM suggests that it is not estopped from asserting its claim because "AMI cannot establish that it acted in good faith, or that it took reasonable and diligent steps to avoid the infringement and ultimately infringed only when it was unable to avoid that infringement as a direct result of the violative conduct of IBM." IBM's Post–Trial Memorandum of Law, at 55. I do not agree that *Tempo* limits the application of estoppel to those instances in which the infringing party attempted to avoid infringement in good faith. In *Tempo*, the Court did hold that ASCAP was estopped from asserting its infringement claim because the infringement "was caused and brought about, in part at least, by the dereliction of ASCAP in failing to facilitate [the defendant's] ex-

pressed intention of avoiding infringement." 407 F.2d at 507. But the defendant's desire to avoid infringement was relevant in *Tempo* only because ASCAP had violated its duty under the consent decree to provide information to those seeking to avoid infringement of ASCAP's copyrights. 407 F.2d at 507. Section VII(d)(3) of the present Consent Decree limits IBM's ability to prohibit or submit to its control or approval alterations performed by anyone, not merely those who perform alterations in good faith. IBM notes that the Consent Decree was modeled after the decree entered by Judge Wyzanski in *United States v. United Shoe Machinery Corp.*, 110 F.Supp. 295 (1953), *aff'd* 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954). IBM argues that the Consent Decree therefore must provide IBM with at least as much protection for intellectual property as the *United Shoe* decree, which, according to IBM: permitted machine owners to alter and experiment with machines only insofar as they did not infringe United Shoe's patents; required United Shoe to license patents at a reasonable royalty to anyone except a deliberate infringer; and did not oblige United Shoe to sell parts at prices that would enable a customer to construct a machine out of assembled parts at a lower price than United Shoe charged for an entire machine. IBM's Post–Trial Memorandum of Law, at 58 (citing *United Shoe,* 110 F.Supp. at 353–354).

While IBM and the United States may have modeled the Consent Decree on the *United Shoe* decree, there is no question that the Consent Decree does not contain the specific provisions IBM cites from the *United Shoe* decree. I will not construe the Consent Decree to contain provisions of a previous decree upon which it was modeled which were not actually incorporated into the Decree.

Thus, I find that AMI has established the elements of the defense that IBM is estopped under Section VII(d)(3) from asserting its copyright infringement claim concerning AMI's copying to perform splits. In so holding, I think it is important to note some of the issues I have not decided. I do not hold that IBM cannot charge AMI and others for 3090 microcode to perform splits or that it could not assert its copyright infringement counterclaim if it did not price the 3090 microcode for splits as it does.[39] I also express no opinion concerning IBM's duty under Section VI(b) of the Consent Decree to maintain 3090 systems split with 3090 microcode copied by AMI, or concerning whether IBM must sell, or can merely license, 3090 microcode to perform splits under the Consent Decree. Nor do I hold that IBM cannot charge $333,000 for the microcode for a 400E/200E split. But I hold that, if it does levy this charge as to such a split IBM cannot enforce its copyright. I hold that because IBM set a price for the 3090 microcode to perform a 400E/200E split intended to eliminate the market for such splits IBM is estopped from asserting a copyright infringement claim against AMI for its copying to perform the four 400E/200E splits.[40]

vi. *Copyright Estoppel Based on IBM's Conduct Relating to 308X Microcode*

■ AMI contends that IBM is estopped from asserting its copyright infringement counterclaim against AMI for copying the 3090 microcode because AMI copied the processor controller microcode of the 308X and earlier IBM large scale computer systems in the same manner with IBM's knowledge and acquiescence.[41] In effect, AMI argues that IBM's conduct regarding one work, the 308X microcode, es-

---

**39.** Thus, I do not hold that IBM can only charge $420 per tape for 3090 microcode to perform splits if it wishes to assert copyright infringement claims against AMI or others for copying to perform splits. Unlike a reconfiguration, a split produces two additional 3090 microcode copies (one active, one backup) for which IBM may recover additional development costs and profits. *See supra,* at 528.

**40.** Because of my holding concerning AMI's copying to perform splits, the discussion of Sections vi through ix below concern only AMI's copying to support reconfigurations.

**41.** AMI's Reply to Amended and Supplemental Counterclaims, Second, Eighteenth and Nineteenth Separate Defenses.

tops IBM from ever asserting an infringement claim concerning any other work, including the 3090 microcode, which performs similar functions in a computer system. AMI does not dispute that an author is entitled to choose not to enforce his or her copyright in one work but to enforce it with respect to another work. Instead, AMI argues that the "role of copyright in a utilitarian environment in which the functional role of the new work is exactly the same as the old one" is different from the role of copyright in protecting plays authored by a playwright, and that therefore estoppel should apply in the former case but not in the latter. AMI's Memorandum in Opposition to IBM's Post–Trial Memorandum of Law, at 53, n *.

I do not accept this distinction. The fact that IBM's works are used to perform similar functions in similar computers does not limit IBM's privilege to choose to enforce its copyright in one work but not to enforce its copyright in another work. Any number of plays, for example, may perform the same function of entertainment, but an author's failure to enforce the copyright in one play does not estop him or her from enforcing the copyright in another. Neither the Copyright Act nor any case law supports the distinction AMI suggests.[42]

AMI also argues that "[w]hether or not the Court does or does not ultimately accept AMI's contentions as to the meaning of the Decree, the extended argumentation in this case should be sufficient to show that they were sufficiently reasonable to serve as a basis for estoppel." AMI's Memorandum in Opposition to IBM's Post–Trial Memorandum of Law, at 54. This argument is without merit. If I adopted AMI's reasoning, I would hold that IBM was estopped from asserting its infringement counterclaim by AMI's incorrect interpretation of a Consent Decree to which it is not a party simply because AMI adamantly maintained its incorrect interpretation prior to and throughout this litigation. I decline to do so.

### vii. Self–Help

■ AMI contends that its copying to compile a library of the 3090 microcode was reasonable self-help justified by IBM's issuance of the Carrier EC, which prevented AMI from gaining access to the five tapes, cassettes or disks containing a system's archival copy of the 3090 microcode. AMI's Memorandum in Opposition to IBM's Post–Trial Memorandum of Law, at 56–57. But the evidence does not establish the facts which AMI claims justified its self-help. IBM issued the Carrier EC in mid–1987, but AMI copied 3090 microcode tapes to build its library as early as March 1987. Guadagno, Tr. at 355–357; Allen, Tr. at 1308–1309; DX 4526. AMI copied hundreds of additional 3090 microcode tapes into its database following the Carrier EC. Guadagno, Tr. at 357; Allen, Dep. Tr. at 865; Allen, Tr. at 1308; DX 4245. Thus, AMI copied 3090 microcode for its library both before mid–1987, when the Carrier EC supposedly made the library necessary, and after mid–1987, when the Carrier EC allegedly prevented AMI from copying the 3090 microcode supplied with a 3090 system. Accordingly, I need not address the question whether reasonable self-help can in some circumstances provide a valid defense to a claim of copyright infringement.

### viii. Unclean Hands

■ AMI also argues that IBM's copyright infringement counterclaim is barred by unclean hands.[43] According to AMI, "IBM realized that its copyright position was credible only if the machine owners did not own the microcode and set out in a carefully orchestrated manner to secure the machine owners' back-up tapes." AMI's Memorandum in Opposition to IBM's Post–Trial Memorandum of Law, at 57–58.

The doctrine of unclean hands applies to bar a claim only if "1) a party seeking affirmative relief 2) is guilty of conduct involving fraud, deceit, unconscionability, or bad faith 3) directly related to the mat-

---

**42.** I therefore do not need to address the question whether IBM copyrighted the 308X microcode.

**43.** AMI's Reply to Amended and Supplemental Counterclaims, Fourth Separate Defense.

ter in issue 4) that injures the other party 5) and affects the balance of equities between the litigants." *Castle v. Cohen*, 676 F.Supp. 620, 627 (E.D.Pa.1987), *aff'd in part and remanded in part on other grounds*, 840 F.2d 173 (3d Cir.1988). Contrary to AMI's assertion, IBM's "copyright position was credible" regardless of whether AMI's customers "owned" the 3090 microcode supplied with their 3090 systems. *See supra*, at 536, n. 15. Moreover, as noted above, I have found that AMI's infringing copying activity went on both before and after IBM issued the Carrier EC. I therefore conclude that IBM's conduct did not involve fraud, deceit, unconscionability or bad faith, and that the doctrine of unclean hands does not apply.

ix. *Other Defenses Asserted by AMI*

In addition, AMI has raised a number of other defenses to IBM's copyright infringement counterclaim, each of which, in my view, is without merit.

AMI asserts that IBM has misused its copyright in the 3090 microcode in violation of Section 1 of the Sherman Act.[44] I need not address the question whether violation of the antitrust laws can constitute a valid defense to a claim of copyright infringement.[45] As I have held in denying AMI leave to supplement its complaint with proposed Counts XI and XII, my previous rulings regarding the relevant market and IBM's market power in deciding AMI's Section 1 claim regarding net pricing of 308X upgrades preclude AMI from establishing that IBM's conduct regarding the 3090 microcode violated the antitrust laws. *See* Order of December 1, 1989, at 5–7.

▆▆▆ AMI claims that its copying of 3090 microcode "as a lawful owner or on behalf of lawful owners" of 3090 systems "was impliedly authorized or licensed by IBM, in fact or in law."[46] An implied license in fact

> arises out of the objective conduct of the parties, which a reasonable man would regard as indicating that an agreement has been reached. It cannot arise out of the unilateral expectations of one party, unless that expectation was deliberately fostered by the unscrupulous conduct of the other party.
>
> *Medeco Security Locks, Inc. v. Lock Technology Corp.*, 199 U.S.P.Q. 519, 524 (S.D.N.Y.1976).

An implied license in law, or a license by estoppel, is established only where the infringer can prove "1) infringement; 2) knowledge by the patent owner of the infringement; 3) conduct of the patent owner which misleads the infringer into believing that the patent owner has abandoned his patent or acquiesced in the infringement; and 4) reliance by the infringer on such conduct." *Minnesota Mining and Mfg. Co. v. Berwick Industries, Inc.*, 373 F.Supp. 851, 869 (M.D.Pa.1974), *aff'd*, 532 F.2d 330 (3d Cir.1976).

AMI produced no evidence that IBM had engaged in conduct that misled AMI to believe that IBM had abandoned its copyright or acquiesced in AMI's copying and no evidence that a reasonable person would regard as indicating an agreement permitting AMI to copy 3090 microcode had been reached. *See supra*, at 547–548. To the contrary, IBM filed its original counterclaim of copyright infringement in late 1986 and its present third counterclaim of copyright infringement concerning copying of 3090 microcode in October 1989. *See supra*, at 525–526.

AMI also raises as a defense that "IBM breached an agreement to provide AMI with a 3090 copyright license when it refused AMI's request for such a license."[47]

---

**44.** AMI's Reply to Amended and Supplemental Counterclaims, Eighth and Ninth Separate Defenses.

**45.** Most courts which have addressed this question have held that violation of the antitrust laws cannot provide a valid defense to a copyright infringement claim. *See* 3 *Nimmer on Copyright* § 13.09[A], at 13-142—13-144 (1990), and cases cited therein.

**46.** AMI's Reply to Amended and Supplemental Counterclaims, Twenty–Third Separate Defense.

**47.** AMI's Reply to Amended and Supplemental Counterclaims, Twenty–Fourth Separate Defense.

I reject this claim as a defense because I conclude that IBM did not enter an agreement to provide AMI with a 3090 microcode license. *See infra,* at 558.

IBM's copyright infringement counterclaim is not barred by the statute of limitations.[48] Under § 507(b) of the Copyright Act, an action for copyright infringement must be commenced "within three years after the claim accrued." 17 U.S.C.A. § 507 (1977). As noted above, IBM's original counterclaim concerning AMI's infringement of the 3090 microcode copyright from the introduction of the 3090 system in 1985 was filed in December 1986. IBM's current third counterclaim, concerning AMI's infringement of the 3090 microcode copyright subsequent to the filing of the original counterclaim, was filed in October 1989. *See supra,* at 526.

■ AMI also has failed to establish that IBM's claim is barred by laches or waiver.[49] The essential elements of a laches defense are "inexcusable delay in instituting suit and prejudice resulting to the defendant from such delay." *Anaconda Co. v. Metric Tool & Die Co.,* 485 F.Supp. 410, 427 (E.D.Pa.1980). AMI has the burden of proving laches, since the alleged delay, as noted above, was less than the three year statute of limitations. 485 F.Supp. at 427. I conclude that there was no inexcusable delay by IBM in instituting its counterclaim. The Court of Appeals for the Third Circuit has observed that waiver "in the strict sense, is the intentional relinquishment of a known right." *Paradise Hotel Corp. v. Bank of Nova Scotia,* 842 F.2d 47, 51 (3d Cir.1988). AMI has produced no evidence of conduct by IBM that reasonably could have led AMI to believe that IBM had abandoned its right to enforce its copyright.

■ Finally, I find that AMI has failed to establish that the 3090 microcode is in the public domain.[50] I have found that this microcode is a copyrightable original work of authorship. *See supra,* at 531–533. It is undisputed that IBM has placed its copyright notice on all publicly distributed copies of the 3090 microcode in compliance with 17 U.S.C. § 401. *See supra,* at 527. Consequently, IBM's distribution of the 3090 microcode with 3090 systems has not placed the microcode in the public domain and caused IBM to forfeit its copyright. *Cf. NEC Corp. v. Intel Corp.,* 10 U.S.P.Q. 2d 1177, 1180–1183, 1989 WL 67434 (N.D. Cal.1989) (holding that Intel forfeited its copyright because of the microcode it distributed 10.6% did not contain copyright notice).

To summarize, I find that AMI has infringed IBM's copyright in the 3090 microcode to the extent that it has copied the 3090 microcode to support reconfigurations. I also find that AMI has infringed IBM's 3090 microcode copyright to the extent it has made copies to perform the four splits of 400Es into 200Es, including copies made for AMI's library which were used for splits, but that IBM is estopped from asserting its counterclaim regarding such copying because IBM has violated the Consent Decree in its pricing of the 3090 microcode used to perform such splits.

B. *IBM's Fourth Counterclaim—Breach of Contract for a 3090 400E/200E Split RPQ*

IBM's Fourth Counterclaim alleges that AMI ordered and received from IBM an RPQ to split a 400E into two 200Es, but has not paid IBM therefor. AMI contends that IBM's contract to sell the RPQ violates Section VII(d) of the Consent Decree, and that IBM is barred from asserting its breach of contract claim by unclean hands, laches, waiver and estoppel.

The evidence established that AMI breached its contract to purchase a split RPQ from IBM by refusing to pay for it. In a letter to IBM dated January 9, 1989, AMI ordered an RPQ to split without IBM labor a 400E with the serial number 70409

---

**48.** AMI's Reply to Amended and Supplemental Counterclaims, Third Separate Defense.

**49.** AMI's Reply to Amended and Supplemental Counterclaims, Second Separate Defense.

**50.** AMI's Reply to Amended and Supplemental Counterclaims, Seventeenth Separate Defense.

into two 200Es. DX 4046. At that time, the price for the RPQ ordered by AMI was $324,000. Caswell, Tr. at 604. When IBM processed AMI's order, it informed AMI that the earliest date it could ship the order was May 19, 1989. Caswell, Tr. at 605. AMI requested IBM to ship the entire order earlier, and to ship the 3090 microcode before other parts if the microcode was available earlier. IBM shipped the 3090 microcode to AMI on January 30, 1989, and the other parts for the RPQ on March 8, 1989. Caswell, Tr. at 606–609; Allen, Tr. at 1108–1109.

Under the Agreement for the Purchase of IBM Machines, which applies to all purchases by AMI from IBM, payment for the RPQ was due in full on the date of installation, i.e. thirty days from the date the order was shipped. DX 4019. AMI's payment of $324,000 thus was due on April 8, 1989, thirty days after the remainder of AMI's order was shipped. IBM has sent notices and invoices to AMI, but AMI has refused to pay the $324,000 due. Caswell, Tr. at 609–611; Allen, Tr. at 1109; DX 4016; DX 4017; DX 4018. AMI has sought to return the parts IBM provided in the RPQ other than the 3090 microcode, but IBM has refused, citing its standard policy against returns reflected in the notice of shipment provided with the 3090 microcode shipped on January 31, 1989. Caswell, Tr. at 609–610; Allen, Tr. at 1108–1109; DX 4015.

■ AMI contends that § VII(d) of the Consent Decree prohibits IBM from charging approximately $284,000 for the 3090 microcode necessary to perform a 400E/200E split,[51] as well as from requiring the purchase of hardware parts to complete a split in order to buy from IBM the 3090 microcode required for the split.[52] AMI's Memorandum in Opposition to IBM's Post–Trial Memorandum of Law, at 14–15. I conclude that the alleged violations of the Consent Decree cannot provide a defense to IBM's breach of contract claim.

The District Court for the District of Connecticut rejected the assertion of a violation of a consent decree as a defense to a breach of contract claim in *May Department Stores Co. v. First Hartford Corp.*, 435 F.Supp. 849 (D.Conn.1977). In *May*, the plaintiff claimed that the defendants had breached a contract to provide a leasehold in a department store. The defendants asserted that under a consent decree between the plaintiff and the Federal Trade Commission ("F.T.C."), the plaintiff could not obtain any department store without the F.T.C.'s consent, and that the plaintiff had failed to obtain consent to make the contract in question. The Court held that such a consent decree violation could not constitute a defense to a breach of contract claim:

> a consent decree does not embody the forceful legal mandate necessary to justify permitting a third party to rely upon it in order to relieve himself from an obligation that he has voluntarily assumed. Moreover, to permit the collateral use of the consent decree here runs contrary to its contractual nature because nothing in the decree indicates that the parties intended third party enforcement.... The F.T.C.'s discretionary power would be severely diminished if private litigants were able to compel the enforcement of its orders, and that would be the effect of permitting third parties to raise violations of the orders as a defense to an otherwise valid contract.

> 435 F.Supp. at 853–854 (footnotes omitted).

I adopt the reasoning of the *May* Court, and conclude that AMI cannot defend against IBM's breach of contract claim by asserting that IBM violated the Consent Decree by entering the contract for the 400E/200E split RPQ. When AMI offered to enter an agreement to purchase the split RPQ, it was fully aware of the price, and that the RPQ included hardware parts. Permitting AMI to enter a contract which it

---

**51.** Allen testified that of the $324,000 price for the 400E/200E split RPQ, approximately $40,000 was attributable to hardware parts, and the remainder to the 3090 microcode. Allen, Tr. at 1108.

**52.** AMI's Reply to Amended and Supplemental Counterclaims, Tenth, Eleventh, Twelfth and Fourteenth Separate Defenses.

believed violated the Consent Decree, breach the contract, and then defend against the breach of contract claim by claiming that the contract violated the Consent Decree in effect would permit AMI to enforce the Decree. This is so because, in such a situation, AMI attempts to relieve itself of a voluntarily assumed obligation to purchase the split RPQ at the price which violates the Consent decree.[53]

In contrast, AMI's asserted Consent Decree defenses to IBM's copyright infringement counterclaim were not offensive uses of the Decree, because IBM's alleged Consent Decree violations were not asserted by AMI to relieve itself of a voluntarily assumed obligation. See supra, at 542–543.

AMI argues that IBM's claim is barred by the doctrine of unclean hands.[54] According to AMI, AMI had downgraded the 400E to a 280E and sought an RPQ for $250,000 to split it without IBM labor into two 180Es. IBM refused to sell AMI the 280E/180E split RPQ on the basis that the 3090 system for which AMI sought an RPQ actually was a 400E, not a 280E. Caswell, Tr. at 613; Allen, Tr. at 1107–1109. I conclude that IBM's conduct in refusing to sell AMI the 280E/180E split and accepting AMI's offer to purchase the microcode for a 400E/200E split did not involve fraud, deceit, unconscionability, or bad faith, and that therefore the doctrine of unclean hands does not apply. See supra, at 548–549.

IBM asserted its fourth counterclaim against AMI in October 1989, within six months of the breach alleged by IBM. Accordingly, the claim is not barred by the applicable statute of limitations.[55] Nor did AMI produce any evidence of conduct by IBM during that period which would bar IBM's claim under the doctrines of laches, waiver or estoppel.[56]

In short, I find that IBM has established that AMI breached its contract for a 400E/200E split RPQ, and that AMI has not established any defense to IBM's claim.

C. *IBM's Fifth and Sixth Counterclaims—Lanham Act and Unfair Competition for 3090 Microcode Labels and Screen Notices*

IBM claims that AMI has violated Section 43(a) of the Lanham Act[57] and has engaged in unfair competition under Pennsylvania law in two ways: by affixing counterfeit IBM labels to copies of the 3090 microcode which it made and distributed to

---

**53.** See also Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 750, 95 S.Ct. 1917, 1932, 44 L.Ed.2d 539 (1975) ("[A] well-settled line of authority from this Court establishes that a consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it even though they were intended to be benefitted by it"); United States v. American Society of Composers, Authors and Publishers, 341 F.2d 1003, 1008 (2d Cir.) ("the government is the sole proper party to seek enforcement of government antitrust decrees"), cert. denied, 382 U.S. 877, 86 S.Ct. 160, 15 L.Ed.2d 119 (1965).

**54.** AMI's Reply to Amended and Supplemental Counterclaims, Fourth Separate Defense.

**55.** AMI's Reply to Amended and Supplemental Counterclaims, Third Separate Defense. The Agreement for Purchase between AMI and IBM contains a New York choice of law provision. DX 4019. Under New York law, the statute of limitations for commencement of a breach of contract action is six years. N.Y.Civ.Prac.L. & R. § 213(2).

**56.** AMI's Reply to Amended and Supplemental Counterclaims, Second Separate Defense.

**57.** Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
(1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
(2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
15 U.S.C.A. § 1125(a) (Supp.1990).

customers; and by displaying IBM's copyright notice on the 3090 system operator console screen when a 3090 system powers up using AMI copied 3090 microcode. I find that IBM has established that AMI has violated the Lanham Act and engaged in unfair competition regarding the counterfeit labels, and that AMI has not established any defense to IBM's claims regarding the labels. I also find that IBM has failed to establish its claim regarding the notice on the 3090 system operator console screen.

To establish its claim under the Lanham Act, IBM must show "1) the involvement of goods or services; 2) an effect on interstate commerce; 3) a false description or designation of origin with respect to the goods or service involved; and 4) a reasonable basis for the belief that one has been injured." *Manufacturers Technologies, Inc. v. Cams, Inc.*, 706 F.Supp. 984, 1003 (D.Conn.1989). The elements of an unfair competition claim under Pennsylvania common law are identical to those required under the Lanham Act, except that no showing regarding interstate commerce is necessary under Pennsylvania law. *Moore Push–Pin Co. v. Moore Business Forms, Inc.*, 678 F.Supp. 113, 116 (E.D.Pa.1987).

I find that IBM has established all of the elements of its Lanham Act and unfair competition claims regarding AMI's labels for 3090 microcode. The evidence was that AMI made and affixed labels to the copies of the 3090 microcode it created and supplied with reconfigured or split 3090 systems. These labels were virtually identical to the labels IBM made and placed on the archival 3090 microcode tapes, cassettes or disks. *See supra*, at 530. AMI provided 3090 microcode with these labels to its customers throughout the United States. DX 4117.

AMI argues that it is not a violation of the Lanham Act to identify the IBM 3090 microcode as such, citing comment b to § 24 of the Restatement of Unfair Competition (Tent. Draft No. 2, 1990). I do not

accept this contention. The evidence establishes that AMI affixed labels identifying the 3090 microcode which it had copied or assembled from copies as property of, and created by, IBM. This plainly is a false description and designation of origin for the 3090 microcode copied and created by AMI, even if placed on a duplicate made by AMI of a copy of 3090 microcode which was in fact property of, and created by, IBM.

AMI contends that IBM failed to establish any likelihood of confusion "[s]ince AMI's customers, the leasing companies, were aware that AMI copied and modified the microcode on which the labels were placed and since end users were unlikely to see the labels." AMI's Memorandum in Opposition to IBM's Post–Trial Memorandum of Law, at 60. I do not find this contention credible. If AMI's customers were unlikely to see the label for a 3090 microcode tape, there would be no reason for AMI, as AMI President Allen admitted, "intentionally [to] attempt[] to duplicate" the IBM 3090 microcode label. *See supra*, at 530. Moreover, IBM has submitted deposition testimony of four AMI customers who, when shown the tape labels made by AMI, said that they believed IBM, not AMI, had generated or was the owner of the labelled 3090 microcode tapes. Fleetwood Dep., Tr. at 40–42; Holtz Dep., Tr. at 15–16; Swiatek Dep., Tr. at 37–38; Wrigley Dep., Tr. at 19–20.

According to AMI, IBM is estopped and barred by laches from asserting claims about the labels because it failed to object "to similar AMI labeling practices which have been ongoing since the early 1970s." [58] AMI's Memorandum in Opposition to IBM's Post–Trial Memorandum of Law, at 60. In support, AMI cites only *Houston Sports Association, Inc. v. Astro–Card Co., Inc.*, 520 F.Supp. 1178 (S.D. Tex.1981). The *Houston Sports* Court held, however, that a trademark owner cannot be estopped solely by his or her failure to object to previous infringement: "There was no conduct, other than silence, that might have affirmatively mislead (sic) the

**58.** AMI's Reply to Amended and Supplemental Counterclaims, Second Separate Defense.

defendant into believing that the plaintiff had abandoned its rights. Silence, without more, is insufficient to support the defense of estoppel." 520 F.Supp. at 1182.

Nor do I find that IBM's alleged failure to object to AMI's previous labelling practices bars IBM's counterclaims under the doctrine of laches. There was no inexcusable delay in the filing of IBM's counterclaims. The evidence establishes that IBM first discovered that AMI was creating false labels for its copies of the 3090 microcode in late 1988, when IBM began analyzing archival 3090 microcode tapes taken from the field which had generated "mismatch" reports. Guadagno, Tr. at 274–278; DX 4574. IBM filed its fifth and sixth counterclaims regarding false labelling of 3090 microcode in October 1989. Because these counterclaims do not concern AMI's labelling practices regarding microcode for the 308X or other previous families of IBM computers, IBM's failure to object to such previous labelling practices is irrelevant.

AMI also has raised the Consent Decree as a defense to IBM's fifth and sixth counterclaims.[59] As with AMI's infringement to support reconfigurations, I find that IBM has not "caused or brought about" AMI's false labelling of 3090 microcode it generated. *See supra*, at 539. The Consent Decree therefore affords AMI no defense to these counterclaims.

■■■ AMI suggests that its labels were required to be placed on the 3090 microcode it created by the Licensed Internal Code provision of the Purchase Agreement under which IBM sells 3090 systems. The Purchase Agreement requires the customer to "include the copyright notice(s) and any legend(s) on each authorized copy." *See supra*, at 527, n. 3. There was no evidence that IBM authorized any of the copies produced by AMI. Moreover, AMI President Allen testified that he did not believe or intend to represent to the Court that AMI's copies of the 3090 microcode were autho-

rized by IBM. *See supra*, at 529. Thus the Licensed Internal Code provision is irrelevant.[60]

■■■ I find that IBM has failed to establish its Lanham Act and unfair competition claims regarding the IBM copyright notice for the 3090 microcode which appears on the 3090 system operator console screen when the system first powers up. IBM's Proposed Finding of Fact ¶ 721 cites only two pieces of evidence in support of IBM's claim that IBM's copyright notice appears on the screen of 3090 systems running AMI–copied 3090 microcode: IBM Customer Engineer Thomas Greene's statement that when a 3092 is first powered up, "something about" an IBM PCU license code appears on the screen; and the videotape demonstration of a simple split performed by AMI, which showed the IBM copyright notice on the screen attached to a 3090 system running microcode supplied by IBM. Greene, Tr. at 891–892; PX 1400. Neither Greene's statement nor the videotape establish that the IBM copyright notice appeared on the screen when a 3090 system ran AMI copied 3090 microcode.

D. *IBM's First Counterclaim—Breach of Contract for 308X Net Priced Upgrades*

■■■ IBM alleges in its first counterclaim that AMI breached three provisions of its Agreement for the Purchase of IBM Machines, *see supra*, at 550, in two specific 308X model conversion transactions. The allegedly breached provisions are: that features are purchased by a customer "for installation or reinstallation on an IBM machine designated by type and serial number"; that features are to be installed as specified by IBM; and that parts removed during the installation of certain features, including net-priced features and model conversions, become the property of IBM. DX 4019. I find that AMI breached these

---

**59.** AMI's Reply to Amended and Supplemental Counterclaims, Tenth, Eleventh, Twelfth and Fourteenth Separate Defenses.

**60.** I also conclude that AMI has not established that IBM's counterclaims are barred by the stat-

ute of limitations or by IBM's unclean hands. AMI's Reply to Amended and Supplemental Counterclaims, Third and Fourth Separate Defenses.

provisions in the two transactions in question.

In the first transaction, AMI ordered and received from IBM pursuant to the Agreement a 3083B to 3083J upgrade for installation on machine serial number 82035. DX 1032; DX 1035. AMI instead used this upgrade to perform a 3083E to 3083J upgrade for CMI, a leasing company, on machine serial number 21455. Allen *AMI I*, Tr. at 293–294; Allen *AMI I* Dep., Tr. at 1294–1297; DX 1025; DX 1033. Because the parts removed in an E to J upgrade are different from those removed in a B to J upgrade, the parts which AMI returned to IBM after performing the upgrade were not the parts required to be returned under the Agreement. Allen *AMI I* Dep., Tr. at 1294–1297. AMI later sent a letter to IBM acknowledging that AMI should have ordered an E to J upgrade from IBM and that an additional $415,000 billing by IBM would be appropriate to make up the difference in price between an E to J upgrade and a B to J upgrade. Allen *AMI I* Dep., Tr. at 1294–1297; DX 1033. AMI also acknowledged in its Financial Report for the period ending April 30, 1987 that this billing would be appropriate and would be paid by AMI. DX 4109, at 18. IBM invoiced AMI $415,000 for this upgrade on December 8, 1989, but has not received payment from AMI. DX 4322.

In the second transaction, AMI purchased a 3083J to 3081K model upgrade for installation on machine serial number 21027. DX 828. AMI instead used this upgrade to perform a 3083B to 3083J upgrade at Northwest Industries for CMI on machine serial number 21607. Allen *AMI I* Dep., Tr. at 1245–1246, 1256–1257; DX 137. AMI did not return to IBM the parts removed during installation of the B to J upgrade, instead using them for a B to J upgrade of machine serial number 21067 for CMI. Allen *AMI I* Dep., Tr. at 1270–

1272; DX 1359. AMI President Allen testified that AMI then was left with eight TCMs [61], some of which AMI later used to perform other upgrades and downgrades. Allen *AMI I* Dep., Tr. at 1272–1274.

AMI does not dispute that it breached its Agreement with IBM, but argues that IBM cannot enforce the Agreement because it violates Sections 1 and 2 of the Sherman Act,[62] and that IBM's 308X net priced upgrade policy violates the Consent Decree.[63] These arguments are without merit. AMI's Section 1 defense is barred by my earlier decision in this action. Likewise, to establish a Section 2 defense, AMI would have to prevail on the same market definition and power issues it lost in the first trial. *See supra*, at 525, n. 1. For the same reason that AMI cannot assert a Consent Decree defense to the breach of contract alleged in IBM's Fourth Counterclaim, AMI cannot assert a Consent Decree defense to this breach of contract counterclaim. *See supra*, at 551–552.

E. *AMI's Count V—Tortious Interference with Contracts and Prospective Contractual Relations Concerning Memory Cards and Splits*

In Count V, AMI claims that IBM tortiously interfered with existing contracts and prospective contractual relations between AMI and its customers. According to AMI, IBM increased the price of memory cards which AMI used in upgrading 3090 systems in order to prevent AMI from performing such upgrades. AMI also alleges that IBM interfered with AMI's splitting of 3090 systems by refusing to provide AMI with a 3090 microcode license pursuant to an agreement to do so, by refusing to provide split RPQs at reasonable prices, and by refusing to certify for IBM maintenance machines split by AMI. I find that AMI has not established the elements of its claims.

**61.** For discussion of TCMs and their significance in the 308X computer family, *see AMI I*, 693 F.Supp. at 267, n. 8, 280–282, 285–286.

**62.** AMI's Reply to Amended and Supplemental Counterclaims, Fifth, Sixth and Seventh Separate Defenses.

**63.** AMI's Reply to Amended and Supplemental Counterclaims, Tenth, Eleventh, Twelfth and Thirteenth Separate Defenses.

The Pennsylvania Supreme Court[64] has adopted the Restatement of Torts's formulation of the elements of a claim for tortious interference with an existing contract:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.
>
> Restatement (Second) of Torts, § 766 (1979); *see Silver v. Mendel,* 894 F.2d 598, 601 (3d Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 2620, 110 L.Ed.2d 641 (1990); *Adler, Barish, Daniels, Levin and Creskoff v. Epstein,* 482 Pa. 416, 393 A.2d 1175, 1183 (1978), *appeal dismissed,* 442 U.S. 907, 99 S.Ct. 2817, 61 L.Ed.2d 272 (1979).[65]

Under Pennsylvania law, in order to establish a claim for tortious interference with an prospective contractual relations, a plaintiff must show: "(1) a prospective contractual relation; (2) the purpose or intent to harm the plaintiff by preventing the relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage resulting from the defendant's conduct." *Thompson Coal Co. v. Pike Coal Co.,* 488 Pa. 198, 412 A.2d 466, 471 (1979); *see Silver,* 894 F.2d at 601–602.

AMI has failed to prove that IBM's pricing of memory cards interfered with any contracts or prospective contractual relations concerning 3090 system upgrades. AMI discovered in August 1988 that it could use 36 four megabyte memory cards sold by IBM for $19,665 each to upgrade a 3090 system from 64 to 128 megabytes at an effective price $372,060 lower than the IBM net price to perform the same up-

grade. Allen, Tr. at 1148–1149, 1351–1353; DX 5372. On August 11 and 12, 1988, AMI ordered a total of 72 four megabyte cards from IBM. Allen, Tr. at 1148–1149; DX 4704. When AMI contacted IBM to order another 36 cards on August 15, 1988, an IBM representative informed AMI that on August 9, 1988, IBM had increased the price from $19,665 to $38,815 per card, but that the new price had not been reflected in IBM's internal parts pricing system when AMI placed its previous orders. AMI then declined to order the additional 36 cards. Bigando, Tr. at 1613–1614; DX 5633; DX 4704. IBM ultimately accepted payment of $19,665 per card for the 72 cards AMI had ordered at that quoted price. Allen, Tr. at 1149, 1354–1355. AMI performed upgrades with the purchased cards, making over $500,000 on the series of transactions. Allen, Tr. at 1355.

AMI alleges that IBM's card price increase interfered with AMI's contracts or prospective contracts to perform upgrades for third parties. But AMI has produced no credible evidence of any actual contracts or prospective contractual relations interfered with by the price increase. The only evidence cited by AMI in its proposed findings of fact is AMI President Allen's statement that AMI already had "other orders" for upgrades when IBM informed AMI of the price increase. Allen, Tr. at 1149. This general assertion does not suffice to prove the existence of specific unperformed contracts or prospective contractual relations. *See Behrend v. Bell Telephone Co.,* 242 Pa.Super. 47, 363 A.2d 1152, 1159–1160 (1976), (defendant Bell prevailed on tortious interference with contract and prospective contractual relations due to plaintiff's failure to show "any specific contract or particular ongoing business arrangement which was terminated as a result of Bell's conduct in failing to provide adequate telephone service") *vacated on other grounds,*

---

64. AMI and IBM agree that Pennsylvania law applies to AMI's Counts V, VI and VII.

65. *See also* Restatement (Second) of Torts § 766A (1979): "One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him."

473 Pa. 320, 374 A.2d 536 (1977). Nor can I infer from the fact that AMI had performed two upgrades with cards purchased at the lower price that AMI had a reasonable probability of entering contracts to perform upgrades in the future. *See General Sound Telephone Co. v. AT & T Communications*, 654 F.Supp. 1562, 1565–1566 (E.D.Pa.1987) (evidence that plaintiff had installed telephone system in one office of third party insufficient to establish reasonable probability that third party would enter contract to purchase another telephone system for a second office).

AMI also has failed to establish its claim for tortious interference with contracts or prospective contractual relations regarding splits of 3090 systems. The only contracts to perform splits for which AMI produced evidence were the four splits which AMI fully performed. Allen, Tr. at 1005, 1357; *see supra*, at 529. IBM certified each of the 3090 systems produced by the four splits for IBM maintenance. PX 1261. Accordingly, AMI has not established that IBM tortiously interfered with any AMI contract to perform a split for a third party.

I conclude that IBM was privileged to commit, or justified in committing, each of the actions which AMI claims constituted tortious interference with AMI's prospective contractual relations for splits. In *Glenn v. Point Park College*, 441 Pa. 474, 272 A.2d 895 (1971), the Pennsylvania Supreme Court discussed the type of conduct which, although not clearly protected by an established privilege, nevertheless is justified:

> The absence of privilege or justification in [tortious interference] is closely relat-

ed to the element of intent.... What is or is not privileged conduct in a given situation is not susceptible of precise definition. Harper & James refer in general to interferences which "are sanctioned by the 'rules of the game' which society has adopted", and to "the area of socially acceptable conduct which the law regards as privileged"....

272 A.2d at 899.

Under Pennsylvania law, AMI has the burden to show that IBM's conduct was not privileged or justified. *Silver*, 894 F.2d at 602, n. 6.

I find that IBM was privileged to refuse or justified in refusing to provide AMI a 3090 copyright license because, for the reasons discussed below, I conclude that IBM and AMI never entered a contract regarding a 3090 microcode license. *See infra*, at 558.

Similarly, I find that, in the context of AMI's tortious interference claim, IBM was justified in stating that it would refuse in the future to certify 3090 systems split by AMI for IBM maintenance.[66] As discussed above, I have found that in performing the splits AMI infringed IBM's copyright in the 3090 microcode. *See supra*, at 530–538. IBM's refusal to certify for maintenance 3090 systems which infringe IBM's 3090 microcode copyright is justified as sanctioned by society's "rules of the game." AMI has not established that IBM is obliged to certify 3090 systems for maintenance, much less 3090 systems infringing IBM's copyright.[67]

Finally, I find that IBM was justified in its pricing of the 3090 microcode necessary to perform splits.[68] As discussed above,

---

**66.** IBM agreed to certify the 3090 systems produced by the four splits AMI performed, but has stated that it will not do so in the future. Conti, Tr. at 205–206; PX 1261.

**67.** AMI cannot contend in the context of this claim that IBM is obliged to certify split 3090 systems for maintenance under the Consent Decree. If AMI could do so, it effectively would be able to enforce the Consent Decree against IBM through the tortious interference claim. As AMI has admitted, as a third party AMI can only assert IBM's alleged Consent Decree violations defensively. *See supra*, at 538–539.

**68.** My holding *supra* that IBM violated the Consent Decree in pricing the 3090 microcode for splits in this matter is irrelevant here. As I have noted, AMI cannot enforce the Consent Decree through a tortious interference claim. *See supra*, at 557, n. 67. The question of whether IBM's pricing structure is justified, and therefore not a tortious interference with AMI's prospective contractual relations, is separate from the question whether it violates the Consent Decree and estops IBM from enforcing its copyright. *See supra*, at 546–547.

IBM set the price at a level designed to eliminate the economic incentive to perform splits by making a 3090 system produced from a split cost the same as the identical 3090 system purchased from IBM. It is undisputed that IBM has charged AMI the same price as everyone else for the 3090 microcode to perform a given split. Charging everyone the same price for a product, whether that price be high or low, is justified as sanctioned by society's "rules of the game." *See Raul International Corp. v. Sealed Power Corp.,* 586 F.Supp. 349, 358 (D.N.J.1984) (dismissing claim that "selling to plaintiffs' customers at prices below those which plaintiffs could afford to charge" constituted tortious interference, but holding that allegation defendant was "*illegally* discriminating in price between plaintiffs and others" stated valid claim of tortious interference) (applying New Jersey and Michigan law); *American Original Corp. v. Legend, Inc.,* 689 F.Supp. 372, 381 (D.Del.1988) (dismissing tortious interference claim, stating that "there is nothing improper about attempting to increase a company's market share or being desirous of a favorable market price") (applying Delaware law).

### F. *AMI's Count VI—Breach of Contract to Provide 3090 Microcode License*

■■ AMI alleges that IBM breached a contract to provide AMI a 3090 microcode license. In its June 15, 1987 Post–Trial Memorandum of Law filed in this Court following the first trial in this action, IBM stated that "AMI does not explain why it did not simply request, and pay for, a [3090 microcode] copyright license from IBM."

PX 1231. Counsel for AMI subsequently contacted IBM's counsel and chief executive officer seeking to obtain a 3090 microcode license, but was unsuccessful. PX 1232; PX 1233; PX 1234; PX 1235. AMI contends that its counsel's letters constituted acceptance of the license offer extended in IBM's brief.

I conclude that IBM did not breach a contract to provide a license because no contract was formed. IBM's statement, made in a memorandum of law filed with this Court, was plainly not a "manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Restatement (Second) of Contracts § 24 (1979).

### G. *AMI's Count VII—Breach of Obligations to AMI as a Third Party Beneficiary of the Document of Understanding between IBM and the Ad Hoc Committee*

■■ In Count VII AMI claims that IBM has not fulfilled its obligations to AMI as a third party beneficiary of a Document of Understanding ("DOU") between IBM and an Ad Hoc Committee of the CDLA and the American Society of Computer Dealers. The DOU, entered in May 1988, resolved the Ad Hoc Committee's complaints about IBM's sales of parts for IBM computers. AMI contends that IBM has breached two DOU provisions: an alleged requirement under Section 4.0 to provide AMI information about "PC Link"; [69] and an alleged requirement under Section 5.0 to provide AMI with engineering changes ("ECs") to

---

**69.** Section 4.0 provides, in relevant part:

4.0. ENGINEERING CHANGES

4.1. IBM will significantly reduce the communication time of the announcement of Engineering Changes ("ECs") (i.e., those changes to IBM machines which IBM provides to owners of IBM machines at no charge which enhance the safety or reliability of those machines) by providing to Customers, in response to their request and for a minimal charge, a listing of such changes in the form of magnetic tape output, or other suitable media.

4.2. IBM will permit owners of IBM equipment, before specific ECs have been announced or are available, to authorize competitive service companies to order ECs for such equipment on their behalf. IBM's acceptance of such authorization shall be contingent upon the competitive service company's having complied with IBM's policies concerning the provision of ECs to owners of IBM equipment. IBM's acceptance of authorization for any competitive service company may be revoked at any time for failure of the competitive service company to continue to comply with those policies.

PX 1271, at 5–6.

the 3090 microcode.[70] I conclude that AMI has failed to establish that it is a third party beneficiary of the DOU, and therefore has failed to establish that IBM has breached any obligation it owes AMI.

In order to establish its claim under the DOU, AMI must show that it is a third party beneficiary of the DOU. The Pennsylvania Supreme Court has established a two part test for determining if one is an intended third party beneficiary of an agreement:

(1) the recognition of the beneficiary's right must be "appropriate to effectuate the intention of the parties," and (2) the performance must "satisfy an obligation of the promisee to pay money to the beneficiary" or "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."

*Guy v. Liederbach*, 501 Pa. 47, 459 A.2d 744, 751 (1983).

AMI contends that it is a third party beneficiary of the DOU because it is a "competitive service company" as that term is used in the DOU. The evidence shows that the parties to the DOU intended the phrase "competitive service company" to encompass only companies which provide maintenance service for 3090 systems. In response to an inquiry by AMI President Allen about the DOU, an IBM representative wrote: "To the best of our knowledge, you are not in the business of performing maintenance on 3090 systems. If this assumption is incorrect, please so advise me." DX 4512. Likewise, the Director of Industry Relations for the CDLA informed Allen that the PC Link information would be made available to AMI upon a showing that AMI was a service company: "Evidence such as a copy of an existing maintenance contract or a customer's letter of intent would be satisfactory." DX 4404.

No evidence has been submitted that AMI provides maintenance service for 3090 systems, or that AMI ever submitted the evidence requested by the CDLA. To the contrary, three AMI employees and AMI co-owner Robert Ade all have testified in depositions that AMI does not and has not ever provided maintenance service for 3090 systems. Ade Dep., Tr. at 238–239; Bromall Dep., Tr. at 12–13; Chisolm Dep., Tr. at 76; Paulits Dep., Tr. at 7. AMI President Allen testified about maintenance and repair service performed by AMI, but also testified that AMI did not perform the "kind of maintenance work" performed by IBM and other companies which maintain 3090 systems. Allen, Tr. at 1144–1145, 1350–1351. To the extent that Allen's testimony conflicts with that of Ade, Bromall, Chisolm and Paulits, I credit their testimony over his.

AMI claims that IBM has admitted in the proposed findings of fact it submitted after the first trial in this action that "AMI is an independent computer service company" and "a data processing service company." But IBM's Proposed Finding of Fact ¶ 19 from the first trial actually is consistent with IBM's contention here: "AMI also has the technical capability to perform remedial maintenance on the equipment it services but has elected not to do so." IBM's Proposed Findings of Fact and Conclusions of Law, June 15, 1987, ¶ 19 (citations to record omitted).

Because AMI has not established that it was an intended third party beneficiary of the DOU, I need not address the question whether IBM has breached any of its obligations under the DOU.

## III. RELIEF

I will enter judgment in favor of IBM on AMI's Counts V, VI, and VII. I also will enter judgment in favor of IBM on AMI's Count II, as AMI cannot prevail on that Count unless my market definition and power rulings in the first trial are not upheld.

70. Section 5.0 provides:
5.0. REMOTE SUPPORT IN THE 3090
5.1. IBM will provide assistance, on a reasonable basis, to competitive service companies to help such companies understand and utilize the remote support capabilities (PC Link) inherent in the IBM 3090.

5.2. To the extent other existing product or products announced by IBM in the future have equivalent remote support capability, IBM will provide similar assistance on such products.
PX 1271, at 6.

I direct AMI and IBM to confer and to attempt to agree within sixty days from the date hereof on the amount of damages which are to be awarded on IBM's First, Third and Fourth Counterclaims. I will refer to a special master determination of the amount of damages on any counterclaim as to which the parties cannot reach an agreement within sixty days.

I direct IBM to submit to this Court and to AMI a proposed order entering judgment in favor of IBM on the various claims and counterclaims in accordance with this Memorandum, and granting injunctive relief for the Third, Fifth and Sixth Counterclaims to the extent that IBM has prevailed on those counterclaims. This submission may, but need not, include agreed upon amounts of damages. AMI may submit its views with respect to IBM's proposal within twenty days after AMI's receipt thereof.

To give the parties guidance regarding injunctive relief for the Third Counterclaim, I state that it is my present inclination to enjoin AMI from further copying except copying exclusively to perform splits, and to require AMI to destroy all 3090 microcode copies it has made which are in its possession except any copies used exclusively to perform splits. Unless the parties can agree on which specific copies must be destroyed, I will appoint a special master to make that determination.

After I have entered judgment (including damages) on the claims and counterclaims discussed in this Memorandum, I will entertain a motion pursuant to Fed.R.Civ.P. 54(b) to certify any or all of the judgments I have entered in this action as final. Such a motion should demonstrate why 54(b) certification is appropriate under the standards set forth in *Curtiss–Wright Corp. v. General Electric Co.*, 446 U.S. 1, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980), *Cemar, Inc. v. Nissan Motor Corp. in U.S.A.*, 897 F.2d 120 (3d Cir.1990), and *Metro Transportation Co. v. North Star Reinsurance Co.*, 912 F.2d 672 (3d Cir.1990).